886 A.2d 136

Stanley R. FRANKEL

v.

Sarah Schlesinger FRANKEL.

No. 708, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Nov. 17, 2005.

556

Cynthia E. Young, Annapolis (Glenn M. Cooper, Patricia M. Weaver, Paley, Rothman, Goldstein, Rosenberg & Cooper, Chartered, Bethesda, on brief), for appellant.

Geraldine W. Hess (Cheryl Lynn Hepfer, on brief), Rockville, for appellee.

Panel MURPHY, C.J., KRAUSER, and JOHN C. ELDRIDGE, (Retired, specially assigned), JJ.

MURPHY, C.J.

The parties to this appeal from the Circuit Court for Montgomery County—Stanley Frankel, the appellant/cross-appellee (Stanley), and Sarah Schlesinger Frankel, the appellee/cross-appellant (Sarah)—were divorced by a Judgment of Absolute Divorce entered by the Honorable Ann N. Sundt. The judgment of divorce included the following provisions:

ORDERED that [appellee/cross-appellant Sarah Schlesinger Frankel's] request for alimony be and it hereby is DENIED, and it is further

ORDERED that [Sarah's] request for a monetary award be and it hereby is DENIED, except that [appellant/cross-appellee Stanley Frankel] is hereby ordered to transfer to [Sarah] 50 percent of the marital portion of the deferred compensation represented by his Genta, Inc. stock as follows: [Stanley] shall transfer to [Sarah] 50 percent of the marital portion (as determined by a coverture fraction, the numerator being the term of his employment with Genta, Inc. after the grant of options and during the marriage, and the denominator being the term of his employment with Genta, Inc. after the grant of options until the date of vesting) of [Stanley's] 119,000 vested and unvested stock

options with Genta, Inc. as well as the 15,000 incentive stock options with Genta Inc, if, as, and when received by [Stanley]; and it is further

* * *

ORDERED that [Stanley] shall pay to [Sarah] 59 percent of all unreimbursed costs of therapy for all four children within ten days of [Sarah's] tendering in writing the receipts for said unreimbursed costs; and it is further

ORDERED that [Stanley] shall pay to [Sarah] 59 percent of the cost of private school education for the parties' four children, said cost to include tuition, books, and all required fees, within ten days of [Sarah's] submitting said bills to [Stanley]; and it is further

ORDERED that [Stanley] shall contribute the sum of $75,000 toward [Sarah's] attorney's fees, and a judgment for [Sarah] against [Stanley] shall be entered within 60 days of the entry of this Judgment of Absolute Divorce if that amount is not paid and satisfied within that period of time[.]

Each party argues that Judge Sundt's rulings were erroneous in three respects. Stanley argues:

I. The trial court failed to afford greater weight to FL. Art. 8–502(b)(8) and abused its discretion when it ordered that Sarah was entitled to half of the marital portion of Stanley's stock options.

II. The trial court erred in calculating the amount of child support because the order violates the policies in the federal Consumer Credit Protection Act and Maryland law.

III. Where the trial court made no finding as to reasonableness or need of attorney's fees, it was not appropriate to award attorney fees to Sarah.

In the words of Stanley's brief:

The trial court did not follow Maryland law when it failed to afford greater weight to FL. Art. 8–502(b)(8) in evaluating how and when Stanley's stock options were acquired. Instead the court gave extra weight to Sarah's "enabling"

under section (b)(1)(8) and (11). The court also abused its discretion by strictly applying *Bangs [v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984)] when two possible modifications were available.

It is also clear that the trial court erred in calculating the amount of child support. The ordered support is both contrary to the purpose and dictates of the Federal Consumer Protection Act and is not consistent with an extrapolation of the Maryland Child Support Guidelines. Further, by failing to attribute gift income to Sarah, the court has placed the burden of private school tuition on Stanley where this expense previously was paid for by Sarah's parents.

Finally, the trial court's award of attorney's fees does not satisfy the applicable statutory requirements, nor did the court make any analysis of reasonableness; the record lacks sufficient evidence from which to make a finding of reasonableness. Further, if Stanley prevails on either of the above two issues, reconsideration of attorney's fees is also required.

According to Sarah, although there is no merit in any of these arguments, she was unfairly prejudiced by the following rulings:

IV. The Trial Court Erred in the Distribution of the Marital Property Stock Options.

V. The Trial Court Erred in Failing to Grant a Monetary Award to the Wife.

VI. The Trial Court Erred in Failing to Designate the Husband's Arrears in Child Support.

In the words of Sarah's brief:

Each of the arguments raised by the husband are simply without merit. The trial court was within its discretion in ordering that the benefits of the husband's stock options be divided between the parties 50/50, and apportioning the non-vested stock options between the martial and separate estates according to the time-rule announced in *Otley [v. Otley,* 147 Md.App. 540, 810 A.2d 1 (2002)].

Further, there is no such thing as a federal cap on child support as evidenced by the federal Consumer Protection Act. The amount of child support awarded is determined by the principles in *Voishan v. Palma* [, 327 Md. 318, 609 A.2d 319 (1992)] and its progeny, and the court did not order excessive child support. Rather, it is clear that the husband can afford the child support, unreimbursed medical expenses, therapy and private school so desperately needed by these children. Moreover, the court did not abuse its discretion in declining to consider the gifts to the wife, gifts that the husband would use to avoid paying for the private school needed by the parties' oldest son.

Finally, the court did not abuse its discretion in awarding attorney's fees to the wife. The record is replete with instances of the husband protracting and prolonging the litigation without regard to the consequences to the wife or the children.

For these reasons, the husband's points are not well taken, and this Honorable Court should affirm the trial court's decision on these matters.

As to the points raised by the wife, the wife requests that the trial court's opinion with regard to the transfer of the stock options themselves be reversed, and the case remanded to the trial court for entry of an order that orders a transfer of the benefits of the stock options to the wife and that the husband holds the stock options in constructive trust for the wife's share, consistent with the wife's recommended order.

The wife further requests that the trial court's decision denying the wife a monetary award be reversed and remanded to the trial court with instructions to enter a monetary award in favor of the wife in the amount of $81,697.10, to equalize the marital property.

Finally, the wife requests that the trial court be instructed to enter an order requiring the parties to account for the funds expended on camp and private school during the pendente lite period, as stated in the Opinion.

For the reasons that follow, we shall affirm the judgment of the circuit court.

## BACKGROUND

Judge Sundt filed a Memorandum Opinion that included the following findings and conclusions:

### *Factual History*

Certain facts are not in dispute. The parties were married June 20, 1982, while they were both in medical school in Chicago. Following the completion of medical school, [Sarah] was accepted in a residency program in New York City, and thus [Stanley] applied to positions in the same city and was accepted at Mount Sinai Hospital in internal medicine. By 1988, [Sarah] had a faculty position at Cornell and [Stanley] was in a fellowship program at Sloan Kettering. In that same year their first son, Joshua, was born (January 25, 1988). The following year their second son, Zachary, was born (December 29, 1989). In 1991, however, when [Stanley] was not offered a staff position at Sloan Kettering, he determined he could not stay in New York City and thus the parties began interviewing in other cities. In that same year the parties moved from New York City to Buffalo, New York, where they lived for three years. In 1992, the parties went to marriage counseling for a period of six or seven months. Their third son, Daniel, was born April 27, 1993.

While in Buffalo, [Sarah] was working three days a week, from 8:30 a.m. to 4:30 p.m. as well as teaching a half-day on Friday. [Stanley] was working long hours, leaving most of the child raising and house management to [Sarah]. The two older boys were enrolled in the Kadema Jewish Day School by agreement of both parties, and for convenience, the older child Josh had been enrolled from the beginning; Zachary was enrolled because he would have been otherwise held back in public school because of his birth date. But both parties were becoming more observant and wanted to give their children Hebrew language training. [Sarah] ko-

shered the home, and the parties observed Shabbat, went to synagogue, and became increasingly involved in the traditions of Judaism. As [Stanley]'s long work hours kept him away from the participation and help with the family, [Sarah] became increasingly unhappy and finally gave [Stanley] an ultimatum: either they were going to move together or she would move with the children.

In 1994 the parties moved to Rockville, Maryland. Despite the parties' expectations to the contrary, [Stanley]'s work hours at the Georgetown Medical Center became very long, causing him to be absent from the home once again. Thus again the responsibilities for the children as well as for the household fell primarily to [Sarah]. Joseph was born December 22, 1994. [Sarah] became employed at the Armed Forces Institute of Pathology (AFIP) full time; one year later, as a result of work that she published, she was invited to work at Walter Reed, where her career flourished. She became one of the top researchers, running a laboratory and supervising eight to ten people. At the same time, [Stanley]'s work hours at Georgetown Medical Center (GMC) escalated because of changes beyond his control. In addition, he spent weekends away from home at professional conferences, where he made contacts that led to additional income as a lecturer and expert witness. Although [Sarah] had help with housecleaning, and at times had both a nanny and an au pair to assist her, [Stanley]'s long hours and weekends away from home left [Sarah] juggling children, household, and her ascending career.

The tension between the parties inevitably resulted in arguments, and as the conflict escalated, it impacted the children. In 1995 Joshua began therapy with Dr. Rebarber because of problems in school. Dr. Rebarber also, at the request of the parties, did some therapy with the parties and with the three younger children. Despite efforts on the part of the parties to follow Dr. Rebarber's recommendations, the conflict between them continued and increased, and that conflict affected the children in that they too began having conflicts with their father and with each other. The

children were all enrolled at the Charles E. Smith Jewish Day School except that Joshua was moved to public school because he could not handle the dual curriculum (English and Hebrew). While he was enrolled in a program for gifted and talented children with learning disabilities he did well in public school, but in eighth grade he was "mainstreamed," and from that point his school experience went downhill to the point that he ultimately refused to go to school. In 1999, [Stanley] lost his position with GMC. The parties discussed moving to New York City at that point, but [Sarah] decided that she could not move until the end of school year 2000, first, because she had a clinical project to complete and secondly, because she wanted Josh to complete his last year in middle school. As a result, [Stanley] took a job at the University of Maryland. The conflict in the family reached a critical point when physical altercations broke out between the boys and their father. In the fall of 2001, after Labor Day, [Sarah] asked [Stanley] to leave. She went with [Stanley] to New Jersey to interview for jobs. She assured [Stanley] that at the end of the school year 2002 she and the children would move up to the New York/New Jersey area, regardless of whether the parties reconciled or not.

In December 2001 [Stanley] left the marital home and moved to Summit, New Jersey, where he had been offered employment by Genta, Inc. The only night that he has stayed with [Sarah] under the marital roof was in February of 2001 following Josh's Bar Mitzvah. In October of 2001, [Sarah] told [Stanley] that she was offered a position at IAVI in New York. Sometime thereafter she advised [Stanley] she was purchasing a home next door to her mother in Brooklyn, New York. In January of 2002, [Sarah] placed Joshua in Valley View, a therapeutic boarding school in Massachusetts where he currently continues to reside. The marital home was sold and the net proceeds have been divided by the parties. In June of 2002, [Sarah] and the children moved to Brooklyn, New York. For several months they lived with [Sarah]'s mother while the residence [Sarah]

purchased was being renovated. Currently [Sarah] has moved into her new residence which is next door to her mother; the three younger children are attending Hannah Senesh, a Jewish day school in New York. Joshua remains at Valley View. [Sarah] is employed by IAVI, where she earns $138,745 annually. [Stanley] continues to be employed at Genta, Inc. at a base salary in 2002 of $207,100. At the time of the trial in the fall, he was residing in a rented apartment in New Jersey.

\* \* \*

### *Alimony*

[Sarah] is seeking alimony and child support. In order to determine the latter, the Court has to make a determination as to whether there should be an alimony award as it will affect [Sarah]'s income for the purposes of any future child support award. The factors that the Court must consider in making an alimony award are set out in § 11–106 of the Family Law Article. The Court will review those factors as they apply to the facts and circumstances of this case.

*(1) The ability of the party seeking alimony to be wholly or partly self-supporting:* [Sarah] is gainfully employed full time. Her current base salary at IAVI is $138,745.20 annually. Prior to moving to New York, her salary in Maryland was $140,000 per annum. In addition, she receives income from the rental of her garage in the amount of $960 a month and interest, dividend and trust income in the amount of $1226.77 per month, for total taxable income of $13,748.87 monthly. [Stanley] would have the Court also impute gift income to [Sarah] based on the history of her family's payments to the parties. For example, traditionally her father gives her $2,000 on her birthday; in 2002, [Sarah] received substantial loans from her father and her mother, including the $330,000 that she has used for gutting and renovating her Brooklyn residence, the approximately $95,000 loan from her father for closing costs on the house, and additional monies for mortgage payments since the time of the

purchase of the Brooklyn residence. [Sarah] lists monthly expenses for herself alone in the amount of $5,040.76, and, without including any imputed income or even addressing the reasonableness of those expenses, the Court finds that [Sarah] is currently able to meet her own expenses. Normally that would be the end of any inquiry on the subject of alimony, but [Sarah] is seeking alimony for an indefinite period, and the statute provides that in such a case, if the Court finds that without an award of alimony there may be an unconscionable disparity in the parties' standard of living, the Court may consider an award of alimony even though the petitioner is self-supporting. Again, that requires an analysis of the factors set forth in § 11–106, and so the Court will continue that analysis.

*(2) The time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment:* There is no question that [Sarah] has "suitable employment." [Sarah] claims that her career growth has been severely limited by the fact that she is the primary caregiver for the minor children. [Stanley] claims that [Sarah] has unilaterally chosen to limit her earnings and her career. He argues that there was no reason for her to leave her job in Maryland. However, the Court notes that [Sarah]'s job in Maryland did not pay her a significantly greater income than she is presently earning in New York. [Stanley] claims, however, that [Sarah] has moved to a more expensive geographical location and has made elections that increased her expenses and those of the children. [Sarah] testified numerous times that a number of her expenses had actually decreased as a result of her move to New York; for example, because her residence is considerably smaller, her utilities and maintenance fees are less. Likewise, her childcare costs are less, in part because of the help provided by her family. [Sarah] acknowledges that she consciously chose to limit her career path, putting her children above her ambition.

She argues that she cannot retrieve those lost years and will need time to refocus her career once the children need less of her time. However, no concrete plan was presented to the Court such as might justify an award of rehabilitative alimony.

*(3) The standard of living that the parties established during their marriage:* By both parties' testimony, other than the payment of the mortgage itself, the largest expense the parties incurred throughout their marriage from the time of the first child's birth was childcare; the next largest was household maintenance. These parties did not live a luxurious life in the sense of cruises, luxury cars, extravagant trips, or lavish furnishings. There were a number of times that gifts from the parties' parents, especially [Sarah]'s parents, enabled the parties to do things they would otherwise not have been able to do, such as purchase a home in Rockville, Maryland, and send their children to private school. There were gifts of jewelry and items of furniture. But their lifestyle, for people who were earning relatively substantial sums of money, was not a luxurious one. Instead, as stated above, most of their money was consumed in child care and child-related expenses such as private school, as well as in home care and maintenance, for with two professional physicians who were trying to raise four little boys, there was not a great deal of time for cooking, cleaning, chauffeuring, lawn mowing, painting, fix-up repairs, etc.

*(4) The duration of the marriage:* The parties were married in 1982; they separated in 2000.

*(5) The contributions, monetary and nonmonetary, of each party to the well-being of the family:* Both parties made monetary contributions; only [Sarah] made significant nonmonetary contributions to the welfare of the family. That statement is not meant to denigrate [Stanley]'s contributions, for he made substantial monetary contributions and has continued throughout the marriage to struggle to ensure that his family's financial needs are met. [Sarah], however, attempted, sometimes not very

successfully, to juggle the needs of small children with a potentially very successful career, and at times stinted one in order to accommodate the other. Ultimately she made the decision to put the children first. In the early years of the marriage, [Sarah] converted what premarital assets she had into joint marital assets. She turned over her paychecks to her husband. And she did the rearing of the children and the managing of the household with outside help but very little help from her husband who was working grueling hours. A number of times, when [Sarah] asked for help, [Stanley] told [Sarah] to hire more help.

*(6) The circumstances that contributed to the estrangement of the parties:* By both parties' testimony, the first ten years of the marriage were relatively happy and successful years. For five-and-one-half years the parties were able to pursue their careers untrammeled by children; then in 1988 the first child was born followed by the second child in 1989, and by 1993 a major problem had erupted concerning the balance between work and home. [Sarah] ultimately chose to cut back on her work and spend more time with the children; [Stanley] never really considered that possibility. Although money was the ostensible source of conflict: who earned it, how it was spent, and the ever increasing need for more money, the real issue between the parties appears to have been an unsatisfied, unresolved allocation of time. From the very beginning, [Stanley] worked long hours, and his lack of participation in the care and raising of the children resulted in both marital conflict and conflict between him and the children. Attempts to address their conflicts in therapy were unsuccessful. [Sarah] undoubtedly experienced some anguish and resentment in having to cut back on an apparently brilliant career in order to fulfill the role of both parents to her four sons. Eventually, the altercations between [Stanley] and the children became physical. [Sarah] asked [Stanley] to leave and he did so.

*(7) The age of each party:* As of the date of trial, [Sarah] was 42 and [Stanley] was 44.

*(8) The physical and mental condition of each party:* Both parties appear to be in good health.

*(9) The ability of the party from whom alimony is sought to meet that party's needs, while meeting the needs of the party seeking alimony:* [Stanley] submitted a financial statement that reflects his ·income and expenses. He earns a base salary of $207,100 per year, or $17,258.34 a month. He acknowledges receiving income from contract work as well as interest and dividend income. For the past two years he has received a bonus of more than $2,500 a month. His gross income totals at least $20,000 a month. He lists expenses for himself alone of $14,000 per month. That includes periodic payments comprising attorney's fees of $3,000 per month and debt servicing of $3,000 per month. If those two monthly expenses were eliminated (and [Stanley] has assets available to him in excess of $350,000), then he would have expenses of $8,000 a month. The Court finds that [Stanley] has the ability to pay some alimony if he were ordered to so do.

*(10) Any agreement between the parties:* There is none.

*(11) The financial needs and financial resources of each party, including:*

*(i) all income and assets, including property that does not produce income;* The Court has discussed the parties' incomes; attached to this Opinion and Order is the Court's Exhibit # 2 showing the parties assets.

*(ii) any award made under Sections 8–205 and 8–208 of this Article;* There is no use and possession award except with respect to the family use personal property. The family home has been sold; the monetary award is discussed below.

*(iii) the nature and amount of the financial obligations of each party:* [Sarah] claims liabilities in excess of $1

million and a total net worth of $865,000. [Stanley] claims liabilities of $157,000 and a net worth of approximately $300,00. The Court finds that their total approximations are fairly accurate. Neither of these parties is in dire financial straits; both have the ability to earn substantial income.

*(iv) the right of each party to receive retirement benefits:* Each has substantial retirement benefits earned during the marriage. [Stanley]'s are the greater.

*(12) whether the award would cause a spouse who is a resident of a related institution ...:* Not applicable.

This Court determines, based on all the above, that neither an award of rehabilitative alimony nor an award of indefinite alimony is supported by the record and will deny [Sarah]'s claim for alimony.

### Property Issues/Monetary Award

A monetary award is designed to accomplish an equitable division of the marital property. The Marital Property Act requires that a three-step process occur: (1) first the Court shall determine which property is marital property; (2) the Court shall then determine the value of all marital property; (3) finally the Court may make a monetary award as an adjustment to the parties' equities and rights concerning marital property after ·consideration of the eleven statutory factors set out in 8–205 of the Family Law Article.

### Step One

The parties supplied a joint statement of marital property (Joint Exhibit # 1) which the Court attaches hereto as Exhibit # 1. There is substantial property in this case, some owned jointly, some owned by one of the parties and the minor children. Fortunately, the parties are able to agree for the most part as to what is marital and what is nonmarital. On page 10 of the Joint Exhibit, the parties

list the property that is in dispute, and the Court will focus solely on that property in this part of the analysis.

### The Real Property at 20 College Place, Brooklyn, New York

The home at 20 College Place, Brooklyn, New York is titled in [Sarah]'s sole name. [Sarah] asserts that it is solely nonmarital; [Stanley] asserts that it is all marital. The party who is asserting a marital interest has the burden to produce evidence as to the nature (and value) of the marital interest. The uncontroverted testimony is that [Sarah] purchased the house in January 2002 for $700,000. She obtained a mortgage that was cosigned by her father, Mr. Schlesinger, who also provided the down payment and monies due at settlement. Moreover the uncontroverted testimony is that Mr. Schlesinger personally or through his trust paid the monthly mortgage directly from the date of purchase to the date of trial with the exception of three monthly payments. The testimony was that Mr. Schlesinger gave [Sarah] a personal check for $11,000 to cover those three months. There is no question that [Sarah] deposited that check into her checking account and paid the mortgage therefrom. At the same time that she was making these mortgage payments with funds from her father, [Sarah] was paying the mortgages on the Maryland home, payments that clearly inured to [Stanley]'s benefit. [Stanley] produced no evidence that the $11,000 deposit was commingled with marital funds to the extent that it was not traceable. Furthermore, [Sarah] borrowed $330,000 from her mother who took out a home equity loan for all the necessary renovations. [Stanley] having produced no evidence to the contrary, the Court finds that the property at 20 College Place, and any appreciation therein, is nonmarital.

### The Genta Stock Opinions

[Stanley] claims that his vested and non-vested stock options from his employer (Genta) were all acquired after the separation of the parties, and that [Sarah] made no

contribution to their acquisition. That may be a factor for the Court to consider in making a monetary award, but it is not dispositive as to the nature of the asset. Under § 8–201 of the Family Law Article, martial property means "property, however, titled, acquired by one or both parties *during the marriage*" (emphasis added) unless it falls under one of the exceptions set forth in 8–201(e)(3) (which exceptions do *not* apply in this case).

Stock options that have vested at the time of the divorce are martial property. Even stock options that are unvested and unexercised at the time of the divorce may be martial, at least in part. The Court may apply a coverture fraction to determine the marital portion. In this case, the coverture fraction is:

*Term of employment after grant of options and during the marriage*

*Term of employment after grant of options until date of vesting*

[Stanley] was granted 120,000 Genta non-qualified options on November 30, 2000. Twenty-five percent of the options vest each year on November 30th, with total vesting in four years. As of November 30, 2002, 60,000 options have vested. [Stanley] sold 1,000 of the options, so 59,000 vested options remain. The 59,000 vested options are marital property. Of the third set of 30,000 options to vest on November 30, 2003, 78 percent (currently 23,400) are marital (numerator 28 months; denominator 36 months). Of the fourth set of 30,000 options to vest on November 30, 2004, 58 percent (17,462) are marital (numerator 28 months; denominator 48 months).

[Stanley] was granted 15,000 Incentive Stock Options as of January 25, 2002, with 25 percent of the options to vest each year on January 25, with total vesting in four years. The first set of 3,750 options vested on January 24, 2003; they are 100 percent marital. The second set of 3,750 options will vest on January 25, 2004, by applying the coverture fraction, the Court determines that 58 percent (2,187) are marital (numerator 14 months; de-

nominator 24 months). The third set of 3,750 options will vest January 25, 2005; 39 percent (1,463) are marital (numerator 14 months; denominator 36 months). The fourth and last set of 3,750 options will vest January 25, 2005; 29 percent (1,088) are marital (numerator 14 months; denominator 48 months).

*SBC Stock*

*Nisource, Inc./Nipsco*

*Investec Stock*

*GE Stock*

*EMC Stock*

*Zimmer Holdings, Inc.*

*McData*

*Bristol Meyers Stock*

All of the above stocks and investment accounts are titled solely in [Sarah]'s name It is a puzzlement to the Court that [Stanley] claims a marital interest in these assets, for he presented no testimony to controvert the testimony of [Sarah] and her father, Mr. Schlesinger, as to the source of these stocks and investment accounts. Their testimony and the documents introduced support the following findings: The Nisource/Nipsco account was given to [Sarah] by her grandparents prior to the marriage; the Investec account was opened with Bristol Meyers Scribb [sic] stock distributed to [Sarah] from her father's trust; SBC, Bristol Meyers Scribb [sic], GE and EMC stocks were either gifted to [Sarah] by her grandfather prior to his death or distributed from her father's trust; the Zimmer Holdings and the McData stock were received as spin-off stocks from the Bristol Meyers Scribb [sic] and EMC stocks. [Sarah] was very clear that up to a certain point in time she had taken premarital assets and titled them jointly, and [Stanley] clearly benefited

[sic] from her doing so. At some point, however, she ceased converting nonmarital gifts and inheritances into joint names. They clearly are *not* marital property as defined by § 8–201(e)(3).

\* \* \*

**Genta Stock Options**

As stated earlier, [Stanley]'s stock options comprise both nonqualified and incentive stock options. With respect to the nonqualified options, the parties cannot agree even as to the number; [Sarah] claims there are 120,000; [Stanley] contends there were 119,000. However, [Stanley]'s numbers do not make sense: he claims that 29,000 vest each year for four years; by this Court's figuring that would make 116,000. On the incentive stock options, both parties agree that 15,000 were granted January 25, 2002, and that 3750 vest each year for four years. As all of these options are a form of deferred compensation, the Court is not required to value them but instead may, under § 8–205 of the Family Law Article, transfer ownership on an "if, as and when" basis regardless of whether a monetary award is made, provided that no notice is given by either party of an intent to present evidence as to the value of the asset. [Sarah] gave and then withdrew such notice. Thus the *value* of this asset need not be considered in the Court's consideration of a monetary award.

\* \* \*

### Step Three

As the Court's Exhibit # 2 reflects, [Sarah] has marital property valued at $362,370.11, all exclusive of the Genta stock options, the furniture and furnishings at each party's home and the marital home, the marital jewelry, and some jointly held accounts. To equalize the parties' interests, the Court would have to award [Sarah] $81,697. But an equal division is not required. The primary objective of a monetary award is equity. And in order to make an equitable decision the Court is required to review the statutory factors set forth in § 8–205 of the

Family Law Article. Many of them are the same or similar to those set forth in § 11–106 of the Family Law Article which the Court has considered in its discussion of alimony above. Thus the non-applicable factors and those which replicate the factors pertaining to alimony will not be repeated here.

*(8) How and when specific property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the martial property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both:* Other than [Sarah]'s nonmarital assets as set forth on Exhibit # 2, and the Prudential account that [Sarah] had prior to the marriage but titled in the parties' joint names at the time of the marriage, all assets were acquired during the marriage with the income of the parties. [Stanley] argues that [Sarah] should not be awarded any of the stock because he acquired it all after the parties' separation without any contribution from [Sarah]. [Stanley] makes the same mistake he made throughout the marriage in not realizing that [Sarah]'s taking nearly 100 percent of the responsibility for the children and the household *enabled* him to focus on and succeed in a job that provides benefits such as stock options. Both parties have substantial pensions, but [Stanley]'s pension shares are significantly greater than [Sarah]'s.

*(9) The contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety:* Not applicable. There is no real estate currently held by the parties as tenants by the entireties.

*(10) Any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home:* As stated above, there is no award of alimony; the Court will, however, make an award of exclusive use and possession of the family use personal property in [Sarah]'s Brooklyn

home for a period of three years, and, if the parties are unable to reach an agreement at the end of that period, a trustee will be appointed and the contents sold and the proceeds thereof divided between the parties. Likewise, unless the parties agree otherwise, 30 days after the entry of this Order a trustee will be appointed and the furniture and furnishings in the possession of [Stanley] will be sold and the net proceeds therefrom divided equally.

*(11) Any other factor that the Court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both:* As stated above, an equal division of the marital property would result in [Sarah]'s receiving an award of $81,697. Given [Sarah]'s considerable nonmarital assets (almost $800,000), this Court does not believe that a monetary award to [Sarah] is necessary to achieve an equitable result. However, the Court concludes that a transfer of ownership in the deferred compensation that is represented by the Genta stock investments *is* appropriate. The Court will order that [Stanley] transfer to [Sarah] 50 percent of the marital portion (using a coverture fraction) of all the Genta stock (including the incentive stock options) if, as and when he receives same, or, if the parties agree, the equivalent value thereof.

This Court is well aware of the career sacrifices [Sarah] has made in order to stabilize, protect and nurture her children. However, she is 42 years old: the youngest child, Joseph will be 18 in ten years, and with each passing year the boys will need less and less of her time and she should be able to devote an increasing amount of time to her career. Her meteor-like advance at least twice in her previous career, once in teaching and once in research, argues well for this very bright, organized and capable person. In addition, she has invaluable assets:

the love as well as the financial support of a very generous family.

### Child Support

This is not a child support guidelines case. Because the combined adjusted actual income of the parties exceeds the Child Support Guidelines, the Guidelines do not control the determination of child support; "[I]f the combined adjusted actual income exceeds the highest level specified in the schedule . . . the court may use its discretion in setting the amount of child support." *See* Md.Code Ann. § 12–204(3) (1999 & Supp.2001). However, the principles of income-sharing that are the underlying tenets of the Child Support Guidelines still apply. *Id.* at § 12–204(a)(1). The Court of Appeals explained the concept of income-sharing in *Voishan v. Palma,* 327 Md. 318, 330–32, 609 A.2d 319 (1992): "Although § 12–204(d) itself does not contain specific language requiring that the judge divide the child support obligation 'between the parents in proportion to their adjusted actual incomes,' this principle certainly underlies the Income Shares Model. . . . Further, the judge should give some consideration to the Income Shares method of apportioning the child support obligation."

[Sarah] earns gross monthly income of $11,562.10. In addition she receives garage rental income of $960.00 per month and interest, dividend, and trust income of $1,226.77 per month, for a total monthly gross income of $13,748.87. That income does not include a regular birthday gift to her from her father or the substantial financial assistance that she has received from her parents in the form of loans and gifts. The assistance that [Sarah] has received in the past has enabled her to defray a number of the children's expenses, but this Court declines to compute child support on gifts from third parties who are under no legal obligation to support these children, particularly in light of the earning abilities of the parties themselves. [Sarah] pays for health insurance for the children, and the incremental cost to her of that expense is $139.03 per month. Because there have

been some problems resulting from both [Sarah] and [Stanley] carrying health insurance for the children, the Court will impose the obligation to provide health insurance on [Sarah] alone. That is not to say that [Stanley] may not provide health insurance, which costs him only $18.20 a month. But [Sarah] is to be the primary health insurance carrier so that all requests for reimbursement are to be submitted through her carrier *first.*

[Stanley] earns as a base salary $17,258.34 per month. For the past two years he has received a bonus, which averages approximately $3,000 a month, but in 2002 was amortized at $2,767.00 per month. He also receives dividend and interest income of $67.00 per month. Finally, depending on how much contract work he does (self-employment income), he earns additional income, but for the purpose of this exercise the court has not included that income because it is less available to him since he began his employment with Genta, and it varies. The Court notes, however, that in positing his monthly income at $20,091.67, that is a *minimum* monthly gross income.

Together the parties earn approximately $33,840.54 a month, well over the maximum of the child support guidelines ($10,000 per month). [Sarah]'s share of that combined income is 41 percent; [Stanley]'s is 59 percent. As stated above, the appellate courts have found that allocating children's costs in proportion to their parents' incomes is appropriate.

[Sarah] lists the children's costs at $19,538.14 per month. That includes all therapy and private school expenses. The Court has made some adjustments to her claimed expenses. (See Exhibit # 3.) For example, the Court has reallocated the mortgage 50–50 between her and the children; approximately $2,400 is a reasonable amount for four children living in Brooklyn, New York. The Court has also eliminated $600 worth of recreation from the children's column, concluding that $1,379.00 per month is more than adequate to address the recreational needs (average $345 per child per month). There are a few other minor changes. The Court eliminat-

ed Zachary's Bar Mitzvah expense in that it will not be a recurring expense. The two major items not included in the children's basic expenses are the extraordinary therapy costs and the cost of private school education. The children's basic expenses total $8,377.90 per month, which the Court has rounded off to $8,400, a reasonable expense for children whose parents together make over $33,000 per month. Apportioning these expenses between the parties in the same ratio as the parties' individual incomes are to the combined income, [Stanley]'s share would be $4,956, which the Court has rounded off to $5,000 per month. That is reasonable basic child support obligation for a parent earning over $20,000 a month gross income. Therefore, [Stanley] will pay to [Sarah] as and for child support the sum of $5,000 per month, beginning and accounting April 1, 2003.

The thorny issue is how to handle the extraordinary medical costs (primarily therapy) and the private school tuition expenses. The three younger children are in therapy with Dr. Spielberg. Therapy costs $175 per session. [Sarah]'s health insurance will pay 50 percent of 20 visits. If the children go to therapy approximately 40 times a year (once a week except for holidays, vacations, etc.), the total cost of therapy for the younger three children is $17,850 or $1,487.50 per month. Joshua, the oldest son, is in therapy with Dr. Cittone. His therapy costs $110 per session. Again, [Sarah]'s health insurance will pay 50 percent of the first 20 visits. She estimates therefore that Josh's therapy expense will be $3,740 annually. Altogether the children's unreimbursed therapy expenses are $21,590 a year, or $1,799 a month. Those costs are not going to continue indefinitely, at least not for all four children. Thus the Court is reluctant to build them into the child support obligation because any change could result in further and frequent litigation. Instead, the Court will order that the unreimbursed costs (after being submitted to [Sarah]'s carrier) be paid 41 percent by [Sarah] and 59 percent by [Stanley]. Because there have been problems with reimbursements in the past, the Court will specify that, upon

receiving in writing the amount of any unreimbursed cost, [Sarah] will submit said writing to [Stanley] and within ten days of receipt [Stanley] is to reimburse her for his 59 percent share. Assuming that the three younger boys' visits will gradually taper off to an as-needed basis, the parties should experience a gradual decrease in these costs. Josh may need to be in therapy more regularly and for a longer period of time.

That leaves the costs of private school. [Stanley] protests that private school is a luxury and that [Sarah]'s relocation did not necessitate the selection of private schooling; rather she elected private school for the children for her own convenience, without considering public schools. The testimony and the record reveals that [Sarah] did in fact consider public schools; she just did not consider public schools in [Stanley]'s neighborhood in New Jersey, which would have resulted in a transportation nightmare. What she learned was that the public schools in her particular part of New York City were not suitable for the three young boys; she is, however, looking into gifted and talented programs in the public schools as the boys become eligible. Thus private school is not an indefinite expense either. But it is a reasonable and appropriate expense for [Sarah] to have incurred at a time of great instability and conflict. She has the three younger boys all enrolled in the Hannah Senesh Community Day School where they receive both their Hebrew schooling and their academic schooling. The school is near their home. It is small and personal. Currently the annual tuition for the three younger boys is $37,250 or $3,104 a month average. In addition, Joshua's tuition, room and board cost $48,900 annually, or $4,075 per month, not including miscellaneous expenses such as his travel home or the cost of the family visiting him. Those latter expenses are to be borne by whichever parent visits Joshua or brings him home. But the tuition, room and board are to be allocated 59 percent to [Stanley] and 41 percent to [Sarah]. The system is the same: [Sarah] receives the bill, sends it to [Stanley], who reimburses [Sarah] within 10 days of its

receipt for his 59 percent. There are funds out of which these extraordinary expenses can be paid. As is clear on the parties' Joint Statement (Exhibit # 1), there are numerous accounts held in the names of the children and one of the parents. Those funds are intended to be used in the child(ren)'s best interest. It is up to [Stanley] whether he wants to make these payments from his income or use the funds that are available.

### Child Support Arrearages

[Sarah] is seeking a judgment for child support arrearages, although she is not seeking arrearages for some of the Court-ordered payments. The Court has already entered a judgment for an arrearage in the amount of $18,703 representing child support arrearages from May 2, 2001 through November 2001 (see Docket Entry # 95). In December 2001, [Stanley] paid [Sarah] $5,168, not the Court-ordered $6,525; in January 2002, [Stanley] paid [Sarah] $4,800, not the Court-ordered $6,525. That created a total arrearage for those two months of $3,082.

The Court has also ordered [Stanley] to pay an additional $368 per month toward the mortgage on the family home, and entered a judgment for an arrearage from May 2, 2001 through November 2001 in the amount of $2,576 (see Docket Entry # 95). Thus from December 2001 until at least the departure of [Sarah] and the children from the family home in June of 2002, [Stanley] should have been paying an additional $368 per month. He did not do so in January. However he made those payments from February through June. Then in July of 2002 he reverted to paying $6,525. The Court will not assess any arrearage after June 2002 because the parties were no longer living in the marital home. However, there does appear to be $368 due and owing for the month of January 2002. Therefore, the Court will enter a judgment for [Sarah] against [Stanley] in the amount of $3,450 which includes $3,082 in child support arrearages and $368 due on the house.

Next, [Sarah] asks the Court to recalculate child support retroactively in order to include expenses that were not included in the *Pendente Lite* Order, such as $6,246 in camp expenses, Josh's Valley View expense, the cost of Josh's Bar Mitzvah lessons and fees, and the children's private school expenses in New York. First, the Court will discount the Bar Mitzvah claim; that was decided *pendente lite*. Second, summer camp expenses of $6,246 were real and actual and paid for by [Sarah]; they were not considered during the *pendente lite* hearing; [Stanley] should indeed make a 50 percent contribution to those expenses ($3,685.14). As to the Valley View expenses, [Stanley] protests making any contribution arguing that the Valley View decision was made without any input or consideration or consent on his part. Yet, all the testimony indicates that Josh has made substantial improvements while at Valley View. The Court has already found that private school is necessary and in the best interest of these minor children, and Valley View in particular appears to meet Josh's needs at the current time. It is not a long-term program, which is why this Court is not building the cost of private school into the child support obligation as was done *pendente lite*. Instead, [Sarah] needs to submit the bills (not including her travel expenses or Josh's allowance) to [Stanley], and upon his receipt of same, he should forthwith tender his 50 percent portion of same. Because of the delay in the decision in this case, it is impossible for the Court at this time to compute what has and what has not been paid and by whom. However, the Court has determined that the cost of private school and camp should be paid, and the Court has determined each party's proportionate share. The parties should be able to pick up the ball from there and make the appropriate payments. [Stanley] further insists that he has overpaid toward private school because the private school expenses were built into the *pendente lite* award. Clearly the children were not in private school during the summer, but they recommenced private school in the fall. The Court has determined that [Stanley]'s child support obligation is

$5,000 commencing April 1, 2003. If he has overpaid (the *pendente lite* amount was $6,525 per month, but *included his share of private school expenses for the children* ), he can receive a credit toward the private school expenses at Hannah Senesh Community Day School or the summer camp expenses. Except as stated above, this Court will not enter a judgment for arrearages at this time, and urges the parties to follow the Court's direction in settling any outstanding dispute they have with respect to arrearages. The message should be loud and clear: the children's therapeutic needs and private education needs are paramount, but they are not going to continue for an indefinite period of time. Both parties should marshal whatever resources they have to focus now on their children's needs and pay for the necessary services as the Court has ordered, proportionate to their incomes.

### Attorney's Fees

[Sarah] and [Stanley] each are seeking attorney's fees. Before making such an award, the Court must consider the statutory factors: the financial circumstances of the parties and the justification in bringing or defending the claim. The financial circumstances have been discussed at length. Although [Stanley] earns more than [Sarah] earns each year by about $100,000, [Sarah] will be receiving over $60,000 in child support, and this helps level the playing field. [Sarah] incurred attorney's fees in excess of $218,000. [Stanley]'s attorney's fees were almost as great ($197,292.24). The attorney's fees comprise the parties' most substantial liabilities (other than the mortgage on [Sarah]'s home). The litigation in this case takes the meaning of "high conflict" to a new level. Throughout the proceeding, this Court has tried to keep focused on the children who have been the ultimate victims of the conflict. An award of attorney's fees to one side or the other, however justly deserved, does not guarantee that the children's needs will be addressed first and foremost. Each of the parties has the wherewithal to pay his or her counsel fees: [Sarah] less so through her

earnings and more so through her nonmarital assets; [Stanley] in part through his earnings and in part through his solely owned assets. The financial circumstances, therefore, do not persuade the Court to make an award to either party. As to the justification on the part of each side, the balance tilts toward [Sarah]. She has had a long and difficult struggle in this litigation, in large part because of [Stanley]'s inability to put the children first. He truly does not yet fully appreciate the damage that the children have experienced and therefore the need for outside services to attempt to provide what the parents were not able to provide. It is not a question of his love for them; it is a question of his limited understanding. It has caused protracted litigation in the custody arena; it has also caused protracted litigation on the financial issues. This Court finds that $75,000 is a reasonable contribution for [Stanley] to make toward [Sarah]'s attorney's fees and will so order.

This appeal followed.

## DISCUSSION

### I. The "Stock Options" Arguments

As stated above, Stanley's brief includes the following argument:

The trial court did not follow Maryland law when it failed to afford greater weight to FL. Art. 8–502(b)(8) in evaluating how and when Stanley's stock options were acquired. Instead the court gave extra weight to Sarah's "enabling" under section (b)(1)(8) and (11). The court also abused its discretion by strictly applying *Bangs* when two possible modifications were available.

According to Sarah, however,

[t]he trial court's opinion with regard to the transfer of the stock options themselves [must] be reversed, and the case remanded to the trial court for entry of an order that orders a transfer of the benefits of the stock options to the wife and that the husband holds the stock options in con-

structive trust for the wife's share, consistent with the wife's recommended order.

There is no merit in either of these arguments.

 Stanley contends that Judge Sundt did not properly apply FL 8–205(b), which provides in pertinent part:

(b) the court shall determine the amount and the method of payment of a monetary award or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors

\* \* \*

(8) how and when specific marital property or interest in the pension, retirement, profit sharing or deferred compensation plan was acquired, including the effort expended by each party in accumulating the marital property or interest in the pension, retirement, profit sharing or deferred compensation plan or both;

\* \* \*

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension retirement, profit sharing or deferred compensation plan or both.

 A trial judge must consider each factor listed in 8–205(b) when determining the amount of monetary award. *Skrabak v. Skrabak,* 108 Md.App. 633, 654, 673 A.2d 732 (1996) (citing *Alston v. Alston,* 331 Md. 496, 507, 629 A.2d 70 (1993)). While the weight of each factor is left to the discretion of the trial court, the eighth factor (relating to how and when specific marital property was acquired, as well as the contribution that each party made towards its acquisition) "should be given considerable weight." *Skrabak,* 108 Md.App. at 654, 673 A.2d 732. The *Skrabak* Court stated:

While no hard and fast rule can be laid down, and while each case must depend upon its own circumstances to insure that equity be accomplished, generally in a case such as this

the eighth factor should be given greater weight than the others. Where one party, wholly through his or her own efforts, and without any direct or indirect contribution by the other, acquires a specific item of marital property after the parties have separated and after the marital family has, as a practical matter, ceased to exist, a monetary award representing an equal division of that particular property would not ordinarily be consonant with the history and purpose of the statute.

*Id.* at 655, 673 A.2d 732 (citing *Alston,* 331 Md. at 507, 629 A.2d 70).

The record shows that Judge Sundt did give appropriate weight to FL 8–205(b)(8). On the date that Stanley accepted employment with Genta, his qualifications for that employment were the result of (1) the education, training, and experience that he received and acquired during the marriage, as well as (2) Sarah's (monetary and non-monetary) contributions to the marriage while Stanley was acquiring the skill and experience that is reflected in his present earning potential.

■ Because there is no evidence that Stanley has exercised—or has refused to exercise—his stock options for the purpose of causing prejudice to Sarah's financial interest, Judge Sundt did not abuse her discretion in providing for transfer on an "if, as and when" basis rather than in providing for transfer in conformity with Sarah's "transfer" and/or "constructive trust" arguments.

## II. Child Support

■ Stanley makes several arguments with respect to his child support obligation, including the argument that he simply cannot afford to pay the amount he has been ordered to pay. Judge Sundt was entitled to reject his "monthly cash flow" argument, which overlooks the fact that he has funds available to satisfy in full financial obligations that he has elected to pay down on a monthly basis. He also argues that the amount of child support ordered by the court exceeds the amount permitted under the Federal Consumer Protection

Act, 15 U.S.C. § 1671 et seq. (hereafter "the Protection Act") and violates the Maryland Child Support Guidelines.

The Protection Act was enacted by Congress to guard against court orders that contemplate garnishment of an excessive percentage of earnings. Congress enacted this legislation because "[t]he application of garnishment as a creditors' remedy frequently results in loss of employment by the debtor, and the resulting disruption of employment, production and consumption constitutes a substantial burden of interstate commerce." 15 U.S.C. § 1671(a)(2). Section 1673(b)(2) states, in relevant part, that:

The maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment to enforce any order for the support of any person shall not exceed-

(A) where such individual is supporting his spouse or dependent child ... 50 per centum of such individual's disposable earnings for that week; and

(B) where such individual is not supporting such a spouse or dependent child described in clause (a) 60 per centum of such individual disposable earning for that week.

According to Stanley, a child support order cannot exceed 60 percent of his disposable earnings. There is no merit in this argument, which ignores the plain language of the Protection Act. The Act limits only the amount that a court can order from garnished wages. It does not limit the amount that a court can order for child support.

Stanley also argues that the award was in violation of Maryland's Child Support Guidelines, which expressly provide that .... if combined adjusted actual income exceeds the highest level specified in the schedule in subsection (e) of this section, the court may use its discretion in setting the amount of child support. FL 12–204(d).

This Court has explained that, when the parents' combined monthly income exceeds $10,000, the [child support] Guidelines do not apply. *Smith v. Freeman*, 149 Md.App. 1,

19, 814 A.2d 65 (2002). "In above Guidelines situations, the statute confers discretion on the trial court to set the amount of child support." *Id.* See also FL 12–204(d); *Voishan v. Palma,* 327 Md. 318, 324, 609 A.2d 319 (1992). In exercising that discretion, the court "must balance the best interest and needs of the child with the parents' financial ability to meet those needs." *Smith,* 149 Md.App. at 20, 814 A.2d 65 (quoting *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986)). " 'Factors which should be considered when setting child support include the financial circumstances of the parties, their station in life, their age and physical condition, and expenses in educating their children.' " *Voishan,* 327 Md. at 329, 609 A.2d 319 (quoting *Unkle,* 305 Md. at 597, 505 A.2d 849).

Stanley argues that Judge Sundt should have used the amount of child support stated at the highest income level in the schedule as a presumptive minimum, and then have extrapolation guide the results. Judge Sundt was not required to do so. In *Malin v. Mininberg,* 153 Md.App. 358, 837 A.2d 178 (2003), this Court stated:

> The legislative judgment was that such high income levels judicial discretion is better suited than a fixed formula to implement the guidelines underlying principle that a child's standard of living should be altered as little as possible by the dissolution of the family. However the trial court need not use a strict extrapolation method to determine support in an above Guidelines case. Rather, the court may employ any "rational method that promotes the general objective of the child support Guidelines and considers the particular facts of the case before it." *Anderson v. Anderson* 117 Md.App. 474, 478 n. 1, 700 A.2d 844, *vacated on other grounds,* 349 Md. 294, 708 A.2d 296 (1998). Nevertheless in above Guidelines cases, calling for the exercise of discretion, the rationale of the Guidelines still applies.

*Id.* at 410–11, 837 A.2d 178.

Awards made under FL 12–204(b) will only be disturbed if there is a clear abuse of discretion. From our

review of the record, we are persuaded that Judge Sundt neither erred nor abused her discretion in establishing the amount of Stanley's child support obligation.

 Stanley also argues that Judge Sundt erred in calculating Sarah's income for child support purposes. According to Stanley, Judge Sundt was required to include gifts and loans from Sarah's parents when calculating Sarah's income. Judge Sundt was not required to include the gifts, "in light of the earning abilities of the parties" and because "the figures are from a source not compelled to support the children."

FL 12–201(c)(4) permits—but does not require—the court to treat the following items as actual income:

(i) severance pay

(ii) capital gains

(iii) gifts or

(iv) prizes.

 Judge Sundt was not clearly erroneous in finding that many of these gifts were assets, e.g. mortgage payments or cash for children's living expenses. A court does not have to consider assets in high income guidelines cases. *Barton v. Hirshberg*, 137 Md.App. 1, 20, 767 A.2d 874 (2001). The issue of whether a particular gift should or should not be included in an "actual income" calculation is best left to the discretion of the trial court,[1] whose decision should not be reversed unless

---

1. The Court of Appeals requires that, in making its determination of what should be considered gifts, the trial court consider (1) the parent's ability to pay the specified child support award; (2) any lack of liquidity or marketability of a party's assets; (3) the fact that a parent's take-home income is not an accurate reflection of his or her actual standard of living; and (4) whether either party is voluntarily impoverished. *Petrini*, 336 Md. at 464, 648 A.2d 1016.

The *Petrini* Court held that a non-custodial father, who was living rent-free (and was not responsible for many bills) with his mother, was required to impute the value of the housing as income for the purpose of determining the appropriate amount of his child support payments. The Court explained that the housing and payment were gifts under 12–201(c)(4) in that they were "voluntary transfer[s] of property to another made gratuitously or without consideration." 336 Md. at 463, 648 A.2d 1016.

that court acted arbitrarily or made a ruling that was "clearly wrong." *Petrini v. Petrini,* 336 Md. 453, 461, 648 A.2d 1016 (1994); *see Gates v. Gates,* 83 Md.App. 661, 577 A.2d 382 (1990). From our review of the record, we are not persuaded that Judge Sundt erred or abused her discretion in rejecting appellant's claim that gifts and loans from Sarah's parents should be included in the calculation of Sarah's actual income.

### III. Monetary Award

[15] Sarah argues that she was entitled to a monetary award. For the reasons set forth in the Memorandum Opinion, Judge Sundt did not agree with that argument. Neither do we.

### IV. Attorney's Fees

█ Stanley argues that Sarah was not entitled to an award of attorney's fees. Family Law Article § 8–214, in pertinent part, states:

(c) Before ordering payment, the Court shall consider:

(1) financial resources and financial needs of both parties; and

(2) whether there was substantial justification for prosecuting and defending the proceeding.

FL 12–103, in pertinent part, states:

(b) before a court may award cost and counsel fees under this section the court shall consider:

(1) financial status of each party

(2) needs of each party; and

(3) whether there was substantial justification for bringing, maintaining or defending the proceeding. 12–103

█ The trial judge has discretion to grant or to deny a request for attorney's fees. *Petrini,* 336 Md. at 468, 648 A.2d 1016. In making that decision the court is bound to consider and balance the considerations contained in FL 12–103. Judge Sundt neither erred nor abused her discretion in concluding that Sarah was entitled to an award of counsel fees.

 An award of attorney's fees in a divorce action should not be modified by the appellate court unless the award was arbitrary or clearly wrong. *Gravenstine v. Gravenstine,* 58 Md.App. 158, 182, 472 A.2d 1001 (1984) (citing *Lopez v. Lopez,* 206 Md. 509, 520–521, 112 A.2d 466 (1955)). A court has discretion to base its award of attorney's fees on the fact that a litigant has engaged in conduct that produced protracted litigation. *Welsh v. Welsh,* 135 Md.App. 29, 761 A.2d 949 (2000); *Gravenstine,* 58 Md.App. at 182–183, 472 A.2d 1001. While each party blames the other for the "protracted litigation," [2] Judge Sundt found that it was Stanley's inability to appreciate the damage done to the children that caused the protracted litigation.

From our review of the record, we hold that this finding was not clearly erroneous.

**JUDGMENT AFFIRMED; APPELLANT/CROSS–AP-PELLEE TO PAY 50% OF THE COSTS; 50% OF THE COSTS TO BE PAID BY APPELLEE/CROSS–APPEL-LANT.**

---

**2.** Appellant/cross-appellee argues that the litigation was protracted due to "Sarah's failure to timely disclose financial information concerning her Brooklyn home that caused the proceeding to become bifurated."

Appellee/cross-appellant argues that the trial was bifurcated because the husband asked for additional time to prepare and review documents provided by the wife and to obtain an appraisal of the real property. The wife disclosed all of the information as soon as it was made available to her.... Further it was the husband who continually asked for and received continuances.