61 A.3d 69

Konstantinos KARANIKAS

v.

Rachel Karanikas CARTWRIGHT.

No. 1314, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Feb. 26, 2013.

572

**574**

Stephen J. Cullen (Kelly A. Powers, Miles & Stockbridge PC, on the brief) Baltimore, MD, for appellant.

Stephen P. Krohn (Angela D. Magruder, Krohn & Krissoff, PA, on the brief) Annapolis, MD, for appellee.

Panel: KRAUSER, C.J., BERGER, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.[1]

---

1. Judge Alexander Wright, Jr., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8–605.1.

BERGER, J.

This case involves an appeal from orders entered in the Circuit Court for Anne Arundel County. The orders awarded sole legal and physical custody of the parties' nine-year-old child ("the child") to appellee, Rachel Karanikas Cartwright ("Mother"), and ordered Konstantinos Karanikas ("Father") to pay child support to Mother. This appeal followed.

Father presents three questions for our review, which we have rephrased as follows:

1. Whether the circuit court abused its discretion by denying Father's motion to disqualify the trial judge.

2. Whether the trial judge abused his discretion due to the manner in which he conducted an interview with the parties' daughter.

3. Whether the circuit court abused its discretion in granting the award of child support.

For the reasons set forth below, we affirm the judgments of the Circuit Court for Anne Arundel County.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father are the parents of a nine-year-old daughter ("the child"), born on July 7, 2003. The parties are also the parents of a son, who is emancipated by reason of age, and is not a subject of the present litigation. Pursuant to the parties' consent order and judgment of divorce, they were awarded joint legal custody of the child. In the event of a conflict with regard to long-range decisions, the parties were required to participate in mediation. Mother was awarded primary physical custody of the child, and Father received a specific visitation schedule.

The consent order and judgment of divorce also awarded Mother use and possession of the marital home for a period of four years. During Mother's use and possession, she was ordered to pay the mortgage, taxes, and interest payment for the marital home. Mother's use and possession period expired on October 5, 2012.

The child had resided in Maryland her entire life. She attended Oak Hill Elementary School in Severna Park, Maryland. On March 1, 2012, Mother sent an e-mail to Father indicating that she intended to relocate to Pennsylvania with the child after the end of the school year. Father did not consent to the relocation. Thereafter, the parties participated in mediation, but were unable to reach an agreement regarding the relocation of the child.

Both parties filed pleadings with the circuit court requesting a modification of the consent order and judgment of divorce with regard to custody and visitation. The circuit court scheduled an expedited trial to address the relocation of the child. Both parties appeared at a pre-trial hearing, propounded and responded to written discovery requests, and participated in depositions. The relocation trial was scheduled for September 7, 2012.

On August 1, 2012, during the pendency of the litigation, Mother registered the child to attend a public school in Pennsylvania. Upon notification of the school registration, Father requested a temporary restraining order and other injunctive relief in the circuit court. The circuit court denied Father's request for a temporary restraining order. Further, the court entered a *pendente lite* order prohibiting the child's registration in school in Pennsylvania, and required the child to start the school year in Maryland until further order of the circuit court and completion of the relocation trial. Accordingly, the child began school at Oak Hill Elementary in Maryland in August 2012.

The trial began on September 7, 2012. Father's counsel alerted the trial court that he planned to have the child testify either in open court or in chambers. At the conclusion of the first day of trial, the trial judge met with the child in chambers. The trial was not completed on September 7, 2012, and was continued to September 12, 2012.

At the beginning of the second day of trial, Father presented an oral motion to disqualify the trial judge, accompanied by a written memorandum of law in support of his motion.

Father alleged that the trial judge had demonstrated bias due to comments he made regarding testimony on the first day of trial. Additionally, Father alleged that the trial judge conducted the child interview inappropriately. Father argued that these actions required disqualification of the trial judge.

The trial judge initially entertained counsel's argument on the motion for disqualification. At the close of counsel's argument, the trial judge referred the motion to another judge for a ruling. As a result, the parties and counsel went to the second judge's courtroom for a determination of the motion for disqualification. The second judge denied the motion for disqualification based upon her review of the written motion and memorandum of law.

The second day of trial proceeded before the original judge. Mother and Father testified regarding their financial resources and expenses. It was undisputed at the trial that the Maryland child support guidelines did not apply because the parties' combined gross monthly income exceeded the guidelines. At the conclusion of the trial, the trial judge held the case under advisement and indicated that his decision would be forthcoming. Father's counsel made an oral motion to stay any order to be issued by the trial judge in the event that the child was relocated to Pennsylvania. The trial judge did not rule on the motion to stay.

On September 13, 2012, the trial judge signed a Memorandum and Interim Custody Order relocating the child from Maryland to Pennsylvania. The order required the child to relocate to Pennsylvania on September 15, 2012. The trial judge faxed copies of the order to counsel the same day, but the order was not entered or docketed by the clerk.

Father's counsel called the trial judge's chambers to inquire when he could be heard on the motion to stay that had been made in open court at the conclusion of the trial. Subsequently, Father's counsel was informed that the trial judge decided to hold Father's oral motion to stay under advisement, that the trial judge would not hear counsel's argument on the motion to stay, and that a decision on any open issues in the

case, including the motion to stay, would follow in a further written order.

On September 14, 2012, Father filed a Notice of Appeal and Emergency Motion for Injunction Pending Appeal. At this time, the interim custody order had not yet been entered on the docket. This Court granted Father's request in part, entering a temporary stay and setting a deadline for Mother to file any written response to Father's motion. On September 17, 2012, the custody order was released from chambers to the clerk's office for docketing.

On September 17, 2012, the trial judge signed and entered a Custody, Visitation, and Support Order and an Order for Sale of Property. This order modified custody, and awarded Mother sole legal and sole physical custody of the child, with a specific visitation schedule for Father. The order also required Father to pay child support to Mother in the amount of $2,883. The order further mandated that Father pay the mortgage and all associated expenses for the former marital home until it was sold.

That same day, Father filed his second notice of appeal, appealing the following orders: the interim custody order entered on September 17, 2012; the custody, visitation, and support order docketed on September 17, 2012; the presiding judge's refusal to disqualify himself from the case; and the second trial judge's denial of Father's motion for disqualification of the presiding trial judge. Subsequently, after the case concluded, the trial judge disqualified himself from the case.

## DISCUSSION

### I. Motion for Disqualification

Father's first argument on appeal is that the trial court abused its discretion by refusing to disqualify the presiding trial judge on the basis of comments the trial judge made during testimony, and his handling of the interview of the child. In Father's view, the behavior demonstrated bias, established the perception that the trial judge was not impar-

tial, and constituted a failure to uphold and apply the law. Mother responds that the judge's conduct did not rise to the level that a reasonable person would perceive as improper or impartial. We agree that the trial court did not abuse its discretion in denying Father's motion for disqualification.

A Maryland judge "shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned ..." Md. Rule 16–813, Md.Code of Judicial Conduct Rule 2.11(a) (the "Rules"). Similarly, "[a] judge shall avoid conduct that would create in reasonable minds a perception of impropriety." Rule 1.2(b). Impartiality under the Rules means the "absence of bias or prejudice in favor of, or against, particular classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." Rules, Section B.

Further, a judge "shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." Rule 1.2(a). The Rules also require that judges "uphold and apply the law and shall perform all duties of the office impartially and fairly." Rule 2.2. Accordingly, "[a] judge shall not, in the performance of judicial duties, by words or conduct, manifest bias, prejudice or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation." Rule 2.3. "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, court staff, court officials, and others with whom the judge deals in an official capacity ..." Rule 2.8.

"When bias, prejudice or lack of impartiality is alleged, the decision is a discretionary one ..." *Surratt v. Prince George's County,* 320 Md. 439, 465, 578 A.2d 745 (1990). A "trial judge is presumed to know the law and apply it properly." *State v. Chaney,* 375 Md. 168, 180, 825 A.2d 452 (2003) (quotations omitted). The person seeking recusal bears a "heavy burden to overcome the presumption of impartiality." *Atty. Grievance Comm'n v. Blum,* 373 Md. 275, 297, 818 A.2d 219 (2003). *See also Reed v. Baltimore Life Ins. Co.,* 127

Md.App. 536, 556, 733 A.2d 1106 (1999) (citing *Jefferson–El v. State*, 330 Md. 99, 107, 622 A.2d 737 (1993)) ("Maryland adheres to a strong presumption that a trial judge is impartial, thereby requiring a party requesting recusal to prove that the judge has a bias or prejudice derived from an extrajudicial-personal-source."). We review a trial court's recusal decision pursuant to an objective standard; namely, "[w]hether a reasonable member of the public knowing all of the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned." *In re Turney*, 311 Md. 246, 253, 533 A.2d 916 (1987).

### A. Bias and Lack of Impartiality

■ Father cites several instances in which the trial judge allegedly demonstrated bias and lack of impartiality due to comments he made regarding the testimony of Father and Father's wife, Deanna Karanikas ("Step–Mother").

### i. Father's Testimony

Father first alleges that he attempted to testify about a suggestion to Mother that the parties extend Mother's use and possession period in the former marital home and that Father would continue to pay the mortgage. Mother's counsel objected, characterizing the discussion as a settlement negotiation. Father's counsel responded to the objection. The trial judge replied: "It's either a settlement offer or nonsense."

Mother argues that this comment is taken out of context, and provides the following complete citation for reference:

That is a negotiation of some kind. I think the relevant, admissible and important part of that is that the Court has previously indicated that she would have exclusive use and possession of the house. Now, of course, the Court can't chain somebody to a house, but she was given that right through October, and she moved out in what would seem about June. Now, I'll let you explain to me at the end of the case why that's relevant, but the fact that he might have offered some—it sounds like a bit like a hyperbole to say,

'I'll pay you to be there 10 years from now.' It's either a settlement offer or nonsense, so in any event, it's stricken. And I'll admit, as I say, only discussions that he attempted to make it easier for her to stay for a longer period of time.

Mother contends that the trial judge's entire commentary makes clear that the trial judge was "merely acknowledging that the proffer contained some form of a negotiation, or settlement offer, and that he would take from it the relevant portions and strike those portions that he felt were irrelevant, or 'nonsense.' "

Next, when Father explained that he went to inspect the former marital home and brought someone with him to see the state of the home, the trial judge commented: "You brought a witness with you, huh? . . . Do you normally take witnesses around with you when you go places?" Mother contends that the trial court was "merely attempting to clarify and understand what happened when Father inspected the house." Mother provides the following citation to the entire exchange:

THE COURT: Is this the U & O house, the formal marital home?

[THE WITNESS]: Yes, the one—

THE COURT: So no one had been living there for how long?

[THE WITNESS]: Maybe a week to two weeks.

THE COURT: Oh, just a—it was within a week?

[THE WITNESS]: Yes, Your Honor.

THE COURT: Okay. All right. Brought a witness with you, huh?

[THE WITNESS]: Yes.

THE COURT: Why'd you bring a witness with you?

[THE WITNESS]: Because I didn't want anyone to think that I went in and did anything, and it was also videotaped.

THE COURT: So you brought a videotape. You want me to watch your videotape?

[THE WITNESS]: No, Your Honor. No.

THE COURT: Okay. All right. Do you normally take witnesses around with you when you go places?

[THE WITNESS]: I normally don't, but for this situation, Your Honor, I felt it was necessary.

THE COURT: All right. Next question.

Mother contends that when reading the entire exchange, it is "unreasonable to interpret the trial judge's questions of the witness as 'improper' or 'hostile'" and that there is "no evidence of partiality or bias within this exchange."

Third, when Father attempted to explain the distance between his home and the child's school, in both miles and driving time, the trial judge commented: "You better slow down. It's more than 60 miles an hour isn't it?" Mother contends that this was nothing more than "a mere observation" after Father testified that to get from his home to the school, "[i]t's approximately a 15–minute drive and maybe about 18 miles away." Mother asserts that it is "unreasonable for this comment to be perceived as partial or biased."

Additionally, the trial judge commented on Father's salary and his employer, Hewlett Packard. After Father testified that his gross monthly income is $22,275.11, the trial judge remarked:

Now that I've heard that number I have to tell you—and that's a good number. I called Hewlett Packard last week to order a computer for my son who's down in college and they couldn't do it because their computers were down.

Mother posits that it "is a significant stretch of the imagination for a person to perceive the trial judge's comment as demonstrative of prejudice or bias based upon [Father's] socioeconomic status. To the contrary, the comment ... shows that the judge was impressed with [Father's] earnings."

Finally, Father contends that during his cross-examination, Father's counsel "was required to repeatedly object to questions ... by the judge himself, because the questions clearly mischaracterized the Father's testimony with respect to his occasional work-related travel." Mother argues that the trial judge merely "asked several questions of the witness in order

to clarify the frequency of his travel." Further, Mother points out that, "it is not uncommon for a witness to be questioned, and for there to be objections to said questions .... a trial judge is vested with the responsibility of fact finding, and in order to do so, will often need to question a witness regarding his or her testimony. This, in and of itself, does not create a hostile and discourteous environment."

### ii. Step–Mother's Testimony

Additionally, Father contends that the trial judge exhibited bias throughout StepMother's testimony. After Step–Mother testified about her various residences over the previous five years, the trial judge asked: "Why so many moves? Why have you live [sic] in four different houses in five years?" Mother asserts that this questioning was appropriate, because when making a custody determination, "the stability of the potential environment" is a relevant factor to be considered by the Court.

Next, Step–Mother explained that in order to drive into the neighborhood of their current home, she travels along Bywater Street. The following exchange ensued:

[MOTHER'S COUNSEL]: The public housing sections, right?

[STEP–MOTHER]: Yes.

[MOTHER'S COUNSEL]: So you got Bywater right outside of Kingsport, is that correct?

[STEP–MOTHER]: Yes, that's correct.

THE COURT: Are you renting? Are you renting?

[STEP–MOTHER]: Well, we have a delayed purchase date, but yes, essentially.

THE COURT: All right. You may want to think about that neighborhood.

Father's counsel then tried to elicit further testimony from Step–Mother regarding the safety of her neighborhood. The trial judge interjected:

I'm going to take judicial notice. It's a horrible, dangerous neighborhood. I mean, I don't know about yours, but unless there's a 40 foot wall between you and them, it's a very dangerous neighborhood, counsel.

Mother contends that it "is appropriate for a trial judge to consider the potential environment(s) in which a child may reside in making a determination regarding custody. The comment is focused on the safety of the neighboring community, not the socioeconomic status ..."

### iii. Discussion

Father contends that the trial judge's conduct and comments pertaining to Father's and Step–Mother's testimony would create in any reasonable mind a perception of impropriety. For this reason, Father maintains that the trial court abused its discretion by finding that disqualification was unwarranted. Alternatively, Father contends that the second trial judge failed to expressly analyze the recusal request, and therefore, the decision not to disqualify the trial judge must be reversed. In support, Father points out that we must "reverse a decision that is committed to the sound discretion of a trial judge" if we are "unable to discern from the record that there was an analysis of the relevant facts and circumstances that resulted in the exercise of discretion." *Maddox v. Stone,* 174 Md.App. 489, 502, 921 A.2d 912 (2007). Father contends that there was no such analysis here, and that reversal is, therefore, required. Mother argues that Father failed to overcome the strong presumption that the trial judge was impartial. We agree with Mother that the trial court adequately considered the recusal motion, and did not abuse its discretion in denying the motion.

In ruling on the motion for disqualification, the second trial judge stated:

Counsel, I have reviewed independently the motion to recuse Judge Goetzke and the memorandum of the law in

support of the disqualification of the trial judge. I am familiar with the case law . . .

* * *

. . . I had read in great detail your memorandum in support of the disqualification of the trial judge, as well as attached Exhibit B, and I am familiar, as I indicated, with the case law in the area.

I find that in light of the allegations, erring on the side of caution, I independently reviewed all that was submitted. As I indicated, I read the memorandum, I'm very familiar with the *Surat* (phonetic) case, and I find that this does not rise to the level warranty [sic] disqualification of Judge Goetzke so I'm going to deny the motion.

As an initial matter, we hold that the second trial judge did not fail to conduct the requisite analysis in ruling on the motion for recusal. Rather, the second trial judge made it abundantly clear that she had carefully considered Father's motion and accompanying memorandum of law. The 16–page memorandum of law articulated each basis for Father's request for disqualification, provided a detailed account of the judge's specific instances of alleged misconduct (including a reproduction of the relevant parts of the trial transcript), and presented a discussion of the applicable law. Although the second trial judge did not discuss the basis for her decision at length, she clearly considered the applicable facts and law. Thus, we find no merit in Father's argument that there was an utter lack of analysis such that reversal is required.

Likewise, we hold that the second trial judge did not abuse her discretion in denying Father's motion for disqualification. We reiterate that a deferential standard of review applies on appeal, and there is a strong presumption that a trial judge acted impartially. Upon reviewing the context surrounding the comments at issue, we hold it was not an abuse of discretion to find that the trial judge's comments did not rise to a level warranting disqualification.

## B. Failure to Uphold and Apply the Law[2]

██ Next, Father contends that the trial judge should have been disqualified due to his failure to uphold and apply the law with respect to interviewing the child. We disagree.

### i. Initial Refusal to Conduct Child Interview

First, Father argues that the trial judge "flatly refused to uphold and apply the law when he initially refused to interview the child at all ..." Our review of the record, however, demonstrates that the trial judge did not "flatly refuse" to conduct the child interview at any point. Rather, when the issue was raised at the start of trial, the trial judge decided to reserve on that issue, explaining that other witnesses might be able to provide the same information, thereby making an interview with the child unnecessary. The trial judge indicated his preference for the parties introducing sufficient evidence without the child's testimony, in order to avoid putting the child in the middle of the dispute between her parents. Thus, since the presiding trial judge never refused to interview the child, the second trial judge did not abuse her discretion in rejecting Father's argument.

### ii. Unreasonableness in Conducting Child Interview

Next, Father contends that after the trial judge allegedly refused to initially conduct the child interview, he "then only agreed to do so in such an extremely limited and unreasonable fashion." Our review of the record shows that Father renewed his request for the trial judge to conduct an interview with the child near the end of the first day of trial. The trial judge agreed. He disclosed to counsel the general questions that he planned to ask the child, and noted that the questions would only take a few minutes. Father requested that the

---

2. This section analyzes whether the second trial judge abused her discretion by failing to disqualify the presiding trial judge based upon his handling of the child interview. Section II addresses whether the presiding judge abused his discretion in his handling of the child interview. The relevant facts related to the child interview are summarized here, and described in greater detail in Section II.

trial judge specifically ask the child about her custody preference. After hearing Father's argument, the trial judge stated: "... I'll just ask again very generally what do you do here, what do you do there, and do you enjoy—we'll see."

Upon completion of the interview in chambers, the trial judge explained to the parties that he asked the child general questions about her interests and hobbies, as well as the following questions: "Do you like being with both parents?"; "Do you like being at one place a little more than the other?"; and "If you could live at one place—with your mom or your dad, which would you prefer?" The child stated that she enjoyed her time with both parents, and had no preference for living with either parent.

Thus, the trial judge not only conducted the child interview, but asked the very questions requested by Father's counsel. Accordingly, we hold that the second trial judge did not abuse her discretion in denying the motion for disqualification on this basis.

### iii. Bias Against Conducting Interviews with Children

Third, Father contends that the trial judge did not uphold or apply the appropriate law in conducting the child interview, and "deprived counsel of appropriate time to present proper argument." This argument is premised on statements that the trial judge made about the implications of conducting child interviews. In particular, after the trial judge initially indicated his desire to reserve on the issue of the child's testimony, Mother's counsel interjected: "Your Honor, may I just say for the record that I would ask the Court not to interview [the child] because I think at nine years old, I just think that's not necessarily appropriate. I think it puts her—no matter how innocuous the questions or discussion may be, I think it still puts her in a position of—" The trial judge agreed, stating:

Yeah, I—you know, you're right. I mean, if she were 14 or 15, maybe something else, but you have the other silly, silly, ridiculous part of this is when they're young, the law says the wisdom is, well, go into chambers with them and don't ask them about their presence [sic]. Well, why are they

going into chambers talking? Well, talk about where they hang their clothes and what cars they like and get a sense, you know, so in 15 minutes, the judge is supposed to become a psychiatrist and divine from listening to the child about where her friends are and what she likes to do, what her preference is, and—anyway, somebody's going to take me to task because I said, so I'd better can it. . . .

In our view, the trial judge did nothing more than comment on Mother's view of the public policy implications of conducting child interviews. The trial judge made clear that the basis for his statements was his sensitivity and concern for young children. Father's counsel understood the exchange as such, commenting: "I understand you on a humanitarian basis— . . ." Father's counsel then went on to articulate the legal standards governing child interviews, and the trial judge listened and considered these arguments. Ultimately, the trial judge adopted Father's rationale, interviewed the child, and asked the child about her custody preference. Thus, the trial judge neither failed to apply the law, nor was counsel deprived of an opportunity to "fully argue the child's preference." Accordingly, the second trial judge did not abuse her discretion in this regard in denying the motion for disqualification.

Father also argues that a child's preference "cannot possibly be ascertained and properly considered with no interview of the child or a very limited interview of the child," and challenges the interview based on the length of time that the trial judge met with the child in chambers. The transcript reflects that the court recessed for twelve minutes, within which the trial judge conducted his interview of the child. As discussed in greater detail, *infra*, the trial judge has discretion as to the length and content of a child interview. Whether an abuse of discretion exists is a case-by-case determination. Here, the trial judge adopted a flexible, "we'll see" approach as to the content and length of the interview. He asked a variety of questions related to the child's interests, pets, relationship with her parents, and custody preference. In our view, the trial judge did not abuse his discretion in handling

the child interview. Accordingly, the second trial judge did not abuse her discretion in denying the motion for disqualification on this basis.

## II. Interview of the Child[3]

██ Second, Father contends that the trial judge abused his discretion in the entire handling of the "intentionally limited chambers interview" of the child. In particular, Father argues that the trial judge abused his discretion because: (1) he only "grudgingly" agreed to interview the child; (2) he only "agreed to do so in an extremely limited way"; and (3) the trial judge "outright refused to inquire as to the child's preference, as required by *Montgomery County v. Sanders*." [4] Mother argues that the trial judge did not abuse his discretion in the handling of the child interview. We agree that there was no abuse of discretion.

██ "Where modification of a custody award is the subject under consideration, equity courts generally base their determinations upon the same factors as those upon which an original award was made, that is, the best interest of the child." *Montgomery County v. Sanders,* 38 Md.App. 406, 419, 381 A.2d 1154 (1977). We have recognized, however, that "there is no litmus paper test that provides a quick and relatively easy answer to custody matters." *Id.* "The best interest standard is an amorphous notion, varying with each individual case ... [t]he fact finder is called upon to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better

---

**3.** For clarification, we note that in Part I, Father argues that the handling of the child interview warranted disqualification of the trial judge. In Part II, Father argues that the custody decision should be reversed due to the trial judge's handling of the child interview.

**4.** Father also discusses, at length, the capacity of the child to participate in the interview, and cases involving a trial court's refusal to conduct an interview with a child. We do not discuss these cases or analyze these issues because the record here is clear that the trial judge conducted an interview with the child.

off in the future. At the bottom line, what is in the child's best interest equals the fact finder's best guess." *Id.*

 In particular, the court must examine "numerous factors" and weigh the advantages and disadvantages of the alternative environments. *Id.* at 420, 381 A.2d 1154. "The criteria for judicial determination includes, but is not limited to, 1) fitness of the parents ... 2) character and reputation of the parties ... 3) desire of the natural parents and agreements between the parties ... 4) potentiality of maintaining natural family relations ... 5) preference of the child ... 6) material opportunities affecting the future life of the child ... 7) age, health, and sex of the child ... 8) residences of parents and opportunity for visitation ... 9) length of separation from the natural parents ...; and 10) prior voluntary abandonment or surrender ..." *Id.* (internal citations omitted). "While the court considers all the above factors, it will generally not weigh any one to the exclusion of all others. The court should examine the totality of the situation in the alternative environments and avoid focusing on any single factor ..." *Id.* (internal citations omitted).

 The trial court has the "discretion to interview a child." *Marshall v. Stefanides,* 17 Md.App. 364, 302 A.2d 682 (1973). "In disputed custody cases, the court has the discretion whether to speak to the child or children and, if so, the weight to be given the children's preference as to the custodian." *Leary v. Leary,* 97 Md.App. 26, 36, 627 A.2d 30 (1993) (citing *Casey v. Casey,* 210 Md. 464, 474, 124 A.2d 254 (1956)). While the preference of the child "is a factor that *may* be considered in making a custody order, the court is not required to speak with the children." *Lemley v. Lemley,* 102 Md.App. 266, 288, 649 A.2d 1119 (1994) (citations omitted).

We have explained that in determining whether to interview a child:

> [T]he child's own wishes may be consulted and given weight if he is of sufficient age and capacity to form a rational judgment.... But we adopt a rule that there is no specific age of a child at which his wishes should be consulted and

given weight by the court. The matter depends upon the extent of the child's mental development. The desires of the child are consulted, not because of any legal rights to decide the question of custody, but because the court should know them in order to be better able to exercise its discretion wisely. It is not the whim of the child that the court respects, but its feelings, attachments, reasonable preference and probable contentment.

*Leary,* 97 Md.App. at 30, 627 A.2d 30 (citing *Ross v. Pick,* 199 Md. 341, 353, 86 A.2d 463 (1952)). We review a trial court's decision relating to the competency of children to testify under an abuse of discretion standard. *Wagner v. Wagner,* 109 Md.App. 1, 24, 674 A.2d 1 (1996).

The following is an excerpt of the trial transcript regarding Father's initial request for the child's testimony:

THE COURT: I am very reluctant to put kids in these disputes between their parents, whether on the stand, in chambers or anywhere else. If somebody believes there's an urgent need for me to talk to [the child], I will hear your argument, but I will tell you I'm very reluctant.

\* \* \*

[FATHER'S COUNSEL]: I understand you on a humanitarian basis.... But that's not really the issue. The issue is that [the child] has factual information that would be helpful to the Court with respect to her school, her friends, and hearing that from the horse's mouth, so to speak, we say, would be very helpful to the Court.

THE COURT: Well, let me see how far we go on the evidence having it testified to by the parents. She's got friends who can testify to that—the rest of it. You know, one day, somebody's going to take me to task in a published opinion, but I think the provision in the law that the judge can talk to a child in these situations is barbaric. I just— you know, 25 years from now, [the child]'s going to be looking back that one or other parent raised her primarily, and she's going to—may very well likely say that's because

I testified against my other parent, and—anyway, I'll reserve on that.

[MOTHER'S COUNSEL]: Your Honor, may I just say for the record that I would ask the Court not to interview [the child] because I think at nine years old, I just think that's not necessarily appropriate. I think it puts her—no matter how innocuous the questions or discussion may be, I think it still puts her in a position of—

THE COURT: Yeah, I—you know, you're right. I mean, if she were 14 or 15, maybe something else, but you have the other silly, silly, ridiculous part of this is when they're young, the law says the wisdom is, well, go into chambers with them and don't ask them about their presence [sic]. Well, why are they going into chambers talking? Well, talk about where they hang their clothes and what cars they like and get a sense, you know, so in 15 minutes, the judge is supposed to become a psychiatrist and divine from listening to the child about where her friends are and what she likes to do, what her preference is, and—anyway, somebody's going to take me to task because I said, so I'd better can it. . . .

The trial judge then indicated that he was reserving on the issue of the child's testimony. Later, the trial judge agreed to conduct an interview with the child. After the trial judge was notified that the child had arrived at the courthouse, the trial court made the following statements:

THE COURT: All right. Well, why don't we take a break now, if you don't mind, and I'll talk with her in chambers for a couple minutes. Just to let you know, I'm going to ask a very general question about what she does when she's up with her mom and what does she do when she's down with her dad, and going to be one or two questions about what she enjoys doing in both places. All right.

[FATHER'S COUNSEL]: Sorry, Your Honor. I—just so the record's clear, I would object to that limitation because one of the factors—

THE COURT: What do you want me to ask her, counsel?

\* \* \*

[FATHER'S COUNSEL]: I would like you to ask her about her school in Oak Hill, how she's doing and her social network.... Her friends, if she's comfortable here and pursuant to *Montgomery County v. Saunders*, if she has any preference—

THE COURT: No.

[FATHER'S COUNSEL]:—to continue—

THE COURT: Don't even ask that.

[FATHER'S COUNSEL]: Okay. Well—

THE COURT: Very specifically, a lawyer—a judge is specifically precluded from asking that question, and I'm surprised that I've been requested to ask it.

[FATHER'S COUNSEL]: Right. I need to make a record here, Your Honor.... And one of the factors is if the child has reached an age and degree of maturity where it's appropriate for her to express her views, then the Court may inquire of the preference.

THE COURT: Well, would you suggest that age nine is such an age?

[FATHER'S COUNSEL]: Right. So that's what I'm getting to, Your Honor, respectfully. As you know, the Court of Special Appeal [sic] has said a child as young as five.... At a minimum, the Court must do a competency test to determine if she is—

THE COURT: Minimum, find they're capable of taking an oath, but being asked for their preference?

[FATHER'S COUNSEL]: But you can't decide that until you meet with her and decide if she's competent or not to answer that question. She may have no preference. I don't know. I've never spoken to the child.

THE COURT: I mean, I—counsel, I've always been told you never ask a kid about a preference if they're at such an age. I mean, maybe I got it wrong.

[MOTHER'S COUNSEL]: I have a problem with that because I think it puts the child in a very untenable position.

THE COURT: I wouldn't ask it even if I could, but I just didn't think you could .... you ask general questions about "what do you do with mom," "what do you do with dad." Well, you know, kid might say, "well, when I'm with so-and-so, you know, I spend the whole time crying. With so-and-so-else, I spend the whole time playing," but oh my gosh, I wouldn't ask a nine-year-old who she wants to live with.

\* \* \*

[FATHER'S COUNSEL]: ... I asked if you could, first of all, determine whether or not you feel she's competent to address that question.... If you decide she's not competent to address that question, of course, I don't want you to ask it.... And if you feel she is competent, then to address it in such a way that's appropriate in your judgment and discretion for what you determine she's like. But the preference is not with respect to mom or dad. The preference is how is she doing in school, would she like to stay in this school with—that's already started.

\* \* \*

THE COURT: ... I'll just ask again very generally what do you do here, what do you do there, and do you enjoy— we'll see. It's going to be the first time I've done this in years, but—....—whatever I do, I'll let you know.

\* \* \*

THE COURT:.... I spoke with [the child] in chambers. Pretty much the way I expected it would come out. She indicated that she was told by stepmom that she might be talking to me, and she said just the kind of questions I'd be asking and she wasn't coached at all. She said that I might ask her, and she wasn't coached at all. She said that she was told to tell the truth. We moved on from that. I asked what she liked to do at both places, and the answer's pretty much the same. When she's with her mom, she likes to play with her friends and go swimming. When she's with

her dad, she likes to go swimming and play with her friends. She has two dogs, a beagle and a redbone coon hound. One of them's named JT at her dad's house. I asked her if she could wave a wand, what would happen after, and understandably, she said, "What do you mean?" And I said, "Do you like being with both parents?" She said, "Yeah." And I said, "Do you like being at one place a little more than the other?" She said, "No." And I said, "If you could live at one place—with your mom or your dad, which would you prefer?" She said, "I don't have a preference."

Upon our review of the record, we see no basis to support the notion that the trial judge only "grudgingly" agreed to interview the child, or that the trial judge only "agreed to do so in an extremely limited way." The trial judge has discretion to decide whether to conduct a child interview. The trial judge exercised this discretion by electing to hear other testimony first in order to determine whether the child's testimony would be useful. The trial judge later considered Father's arguments and ultimately decided to interview the child in chambers. In our view, the trial judge's comment that it would not take long to conduct the interview was intended merely to give notice to the parties as to how long of a recess should be expected, not to express any sentiment about conducting the interview. Moreover, the trial judge adopted a flexible, "we'll see" approach as to the content and length of the interview. He asked a variety of questions related to the child's interests, pets, and her relationship with her parents. We hold that the trial judge did not abuse his discretion in handling the child interview.

Additionally, we find no merit in Father's argument that the trial court "outright refused to inquire as to the child's preference, as required by *Montgomery County v. Sanders*." As an initial matter, we note that *Montgomery County v. Sanders* does not require that a court expressly ask a child his or her custody preference. Although the preference of the child is a consideration for the court, interviewing the child is not the only method by which the trial judge may discern the preference of the child. *See Lemley, supra*, 102 Md.App. at 288, 649

A.2d 1119 ("the court is not required to speak with children"). Regardless, Father's argument on this point is irrelevant, because the record demonstrates that the trial court inquired as to the child's preference. Accordingly, we hold that the trial judge did not abuse his discretion in his handling of the interview of the child.

### III. Child Support Award

 Finally, Father argues that the trial court abused its discretion in entering a child support order "based solely on extrapolated guidelines without fully analyzing and balancing the child's best interests with the Father's ability to pay." Mother contends that it was undisputed that the parties' combined income is above the maximum amount set forth in the guidelines, and that the trial court therefore had discretion to set the amount of child support. Further, Mother posits that the trial court properly exercised its discretion in determining the amount of child support. We agree that the trial court did not abuse its discretion in entering its child support order.

 Generally, "the amount to be awarded for child support is governed by the circumstances of the case and is entrusted to the sound discretion of the [trial judge], whose determination should not be disturbed on appeal unless he arbitrarily used his discretion or was clearly wrong." *Gates v. Gates*, 83 Md.App. 661, 663, 577 A.2d 382 (1990) (citing *Kramer v. Kramer*, 26 Md.App. 620, 636, 339 A.2d 328 (1975)). A trial court's child support award in an "above-guidelines" case is reviewed under the abuse of discretion standard. *See Frankel v. Frankel*, 165 Md.App. 553, 587, 886 A.2d 136 (2005).

Section 12–202(a)(1) of the Family Law Article of the Maryland Code requires a court to use the child support guidelines "in any proceeding to establish or modify child support, whether *pendente lite* or permanent." Md.Code Ann., Fam. Law ("FL") § 12–202(a)(1) (LexisNexis 2012); *Beck v. Beck*, 165 Md.App. 445, 449, 885 A.2d 887 (2005). In *Petrini v.*

*Petrini,* 336 Md. 453, 460, 648 A.2d 1016 (1994), the Court of Appeals explained that:

> The purpose of the guidelines was to limit the role of the trial courts in deciding the specific amount of child support to be awarded in different cases by limiting the necessity of factual findings that had been required under pre-guidelines case law. The legislature also intended the guidelines to remedy the unconscionably low levels of many child support awards when compared with the actual cost of raising children, to improve the consistency and equity of child support awards, and to increase the efficiency in the adjudication of child support awards.

(internal footnotes omitted). "There is a rebuttable presumption that the amount of child support which would result from the application of the guidelines . . . is the correct amount of child support to be awarded," FL § 12–202(a)(2)(i), but that "presumption may be rebutted by evidence that the application of the guidelines would be unjust or inappropriate in a particular case." FL § 12–202(a)(2)(ii); *Knott v. Knott,* 146 Md.App. 232, 251, 806 A.2d 768 (2002).

In *Otley v. Otley,* 147 Md.App. 540, 561, 810 A.2d 1 (2002), we acknowledged that "if the combined adjusted actual income exceeds the highest level specified in the schedule . . . the court may use its discretion in setting the amount of child support." *See* FL § 12–204(d). In *Voishan v. Palma,* 327 Md. 318, 331–32, 609 A.2d 319 (1992), the Court of Appeals stated that:

> [T]he guidelines do establish a rebuttable presumption that the maximum support award under the schedule is the minimum which should be awarded in cases above the schedule. Beyond this, the trial judge should examine the needs of the child in light of the parents' resources and determine the amount of support necessary to ensure that the child's standard of living does not suffer because of the parents' separation.

In *Voishan,* a case in which the parents' incomes were above the guidelines, the husband appealed the court's child

support decision on the basis that the amount of support could not exceed the maximum amount under the guidelines. *Id.* at 325, 609 A.2d 319. The Court of Appeals disagreed, holding that "had the legislature intended to make the highest award in the schedule the presumptive basic support obligation in all cases ... it would have so stated and would not have granted the trial judge discretion in fixing those awards." *Id.* at 326, 609 A.2d 319.

The Court of Appeals in *Voishan* further explained that the legislature specifically declined to set guidelines above a certain amount because "the legislative judgment was that at such high income levels judicial discretion is better suited than a fixed formula to implement the guidelines' underlying principle that a child's standard of living should be altered as little as possible by the dissolution of the family." *Id.* at 328, 609 A.2d 319. The Court of Appeals stated that "extrapolation from the schedule may act as a guide, but the judge may also exercise his or her own independent discretion." *Id.* at 329, 609 A.2d 319 (internal quotations omitted).

In the case *sub judice*, Father first takes issue with the fact that Mother's testimony indicated that the total expenses for herself and her two children were $4,400, and that "if you divided that by [ ] three it would approximate that that would be [the child's] portion." By Father's calculation, this equated to monthly expenses of approximately $1,466.00 for the child. Mother's counsel then submitted an extrapolated child support guidelines worksheet requesting a monthly child support award in the amount of $2,883. The trial court ultimately awarded Mother child support in the amount of $2,883 per month.

Additionally, Father alleges that the child support order demonstrates that the trial judge performed no analysis in making the custody determination. Father contends that the order "merely states in a footnote that '[a]lthough this is an 'above guidelines' case, we apply [the guidelines'] formula in determining Father's obligation. *See* attached worksheet."

We first observe that the child support guidelines were not directly applicable because the parties' combined adjusted income exceeded the maximum level specified in the guidelines. The circuit court determined that the salaries of the parties were $22,275 per month for Father and $4,425 per month for Mother. This amounted to a total of $26,700 combined income, which is $11,700 greater than the $15,000 maximum under the child support guidelines. A combined adjusted income of $15,000 for one child equates to a monthly child support payment of $1,942 under the guidelines. *See* FL § 12–204(e). Consequently, the amount of child support here rested in the sound discretion of the trial court. As such, the court exercised its discretion in ordering Father to pay monthly child support of $2,883, which is $941 more than the top end of the guidelines for one child.

In making the child support determination, the trial judge announced that he was "relying upon *Frankel versus Frankel,* 165 Md.App. 553 [886 A.2d 136], exercising my discretion ..." There is simply nothing in the record to suggest, as Father urges, that the trial judge regarded the extrapolated guidelines amount as a rebuttable presumption, and awarded that amount without any examination of the requisite factors. The trial judge specifically recited his findings with respect to the parties' incomes, the child's best interests, the financial needs of the child, the parents' financial ability to meet the child's needs, the station in life of each parent, their respective ages and physical conditions, and the expenses associated with educating the child. It is evident that the trial judge considered the requisite factors, and made a finding with regard to each factor.

In the same vein, Father's allegation that "the lower court did not make any specific findings with respect to the child's needs and the parent's abilities to pay" is wholly unsupported by the record. To be sure, the trial judge expressly stated that: "It seems to me that the best interest of [the child] and her needs would be for her to be able to continue to maintain as much financial security as she has had in the past." Moreover, the trial judge stated: "with regard to the parent's

financial ability to meet those needs, the financial ability is almost exclusively on the father's part. He makes substantially more money than mother on a reliable and monthly basis and mother's financial circumstances are significantly inferior to those of father." Further, the footnote in the order referring to the guidelines is not dispositive because the transcript makes clear that the trial judge conducted an analysis of the relevant factors and made findings of fact orally on the record.

For the foregoing reasons, we hold that the second trial judge did not abuse her discretion in denying the motion for disqualification. Additionally, we hold that the presiding trial judge did not abuse his discretion in the handling of the child interview, or in the granting of the award of child support. Accordingly, we affirm the judgments of the Circuit Court for Anne Arundel County.

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**