*C.M. v. J.M.*, No. 852, September Term, 2022. Opinion by Wright, J.

**FINAL PROTECTIVE ORDER – SUFFICIENT EVIDENCE OF MENTAL INJURY TO SUSTAIN FINDING OF ABUSE OF A CHILD**

Trial court could find by a preponderance of the evidence that father engaged in mental abuse of his 13-year-old child by creating a substantial risk of harm, and that Father's actions were intentional or with reckless disregard to the consequences of his actions, where, among other things, child expressed during judicial interview with court that he was frightened of father's reaction to child identifying as gay; father's numerous text messages to mother, child's older sibling, and child; and a child protective services report that child did not feel safe with father and child was concerned that father might hit him for identifying as gay.

**FINAL PROTECTIVE ORDER - JUDICIAL INTERVIEW OF CHILD**

Trial court need not provide a detailed recitation of private, judicial child interview. Trial court committed no error when it summarized for the parties the gist of its interview with child.

**FINAL PROTECTIVE ORDER – RELIEF**

Relief granted by trial court was reasonable and well-tailored to the facts presented given father's view of gay child where the relief ordered did not change quantity of contact but stated that visitation can only occur if child "is comfortable doing so" and father may not communicate with child via telephone or text messages about child's sexual orientation.

Circuit Court for Anne Arundel County
Case No. C-02-FM-22-808824

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 852

September Term, 2022

_____

C.M.

v.

J.M.

_____

Kehoe,
Zic,
Wright, Alexander, Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wright, J.

_____

Filed:  May 24, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a
constitutional amendment changing the name of the Court of Special Appeals of Maryland
to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

The Circuit Court for Anne Arundel County entered a final protective order against C.M. ("Father") on grounds that he was mentally abusive to his 12-year-old son ("N.") regarding his son's sexual orientation. On appeal, Father raises three questions, which we have rephrased for clarity:

I.     Did the circuit court err in finding that Father had inflicted mental injury on N.?

II.    Did the circuit court err when it interviewed N. outside the presence of the parties and their counsel?

III.   Did the circuit court err because the relief granted was not reasonably tailored to address the mental injury inflicted?

For the following reasons, we shall affirm.

## BACKGROUND FACTS

Father and J.M. ("Mother") were married for about five years and had two children before divorcing in 2012. As part of the divorce settlement, the parties agreed to joint legal custody of their two children with Mother to have primary physical custody and Father to have visitation every other weekend from Friday to Sunday.

Roughly three years later, on June 15, 2022, Mother filed for a protective order for herself and her children, then aged 15 and 12, alleging that Father had caused her and the children mental injury based on abusive texts and emails he had sent to them. The District Court granted the temporary petition; requested the Department of Human Services investigate and issue a Child Protective Services Report ("CPS Report"), and transferred the case to the circuit court for a final order.

At the final protective order hearing on June 22, 2022, both parties testified, the children were separately interviewed by the court, and several exhibits were entered into evidence, including the CPS Report.

Mother testified that she filed the protective order because she was concerned for her and her children's safety as a result of the numerous texts Father had sent, which over the years had "progressively gotten worse." The parties focused on events that occurred during the four months that preceded the filing of the protective order.

As to their older child, "S.", Mother testified that about three years ago, S. told her that he believed he was transgender.[1] Mother denied steering S. toward identifying as transgender but has actively supported S. by arranging for therapy and attending meetings of Parents, Families, and Friends of Lesbians and Gays ("PFLAG"). When S. told Father that he identified as transgender, Father "opposed" his decision and refused to call him by his preferred name. S. subsequently engaged in the self-harming behavior of "cutting." On March 4, 2022, Father sent the following text messages to S.:

> What is your email address? I'm sending you an email and I'm copying your mother and my lawyer. I'm t[ir]ed the BS manipulations. Your grandmother doesn't call you S[.] and neither does either one of your aunts and uncle up here and for some reason my Christian beliefs are being attacked, so the intent is for a trial, so that everyone can understand what your mother that has manipulated a wedge after you and I had already came to an agreement [to call you a shortened version of your given name]. Thanks[.]

---

[1] We shall refer to the parties' oldest child as "S." which is the first letter of the name the child prefers to be called rather than his given name. We shall also refer to S. with his preferred pronouns, he/him/his.

2

Mother testified that S. is "scared" to be around Father because "he doesn't feel support; doesn't feel that S[.] can be himself, . . . his true self[.]"

As to their younger child, N., Mother testified that about five months ago N. told her that he believed he was gay. On June 11, 2022, Father sent N. the following text:

> You can text me anytime. Just between us and call if you ever need to talk. I will tell you like I told you before – you are being heavily manipulated and influenced by your mother and sister. Son. Listen to your dad and our father who created us (God) in this matter. Please please do not allow these demons you are surrounded by influence you. Pray my son. For protection. I love you. Dad.

The next day, while N. was visiting Father at his house, Father asked N. to show him his TikTok account. According to Father, N. started acting "very strangely[,]" eventually walking outside the house and calling and then texting his Mother. Father testified he told N. that he was not "happy with" him because he had every right to see N.'s social media account. Father then told N. that because he was undercutting his authority by calling Mother, he could "[j]ust go home." N. called his Mother to pick him up and while she was enroute, Father and N. had a conversation in which N. told him he was gay. Father testified that he responded by telling N.: "I love [you] no matter what, and that whatever he is when he's an adult and down the road, that I will love him, but he needs to respect that his father doesn't actually hold the same beliefs due to my Biblical beliefs." He explained to the court that his "Christian beliefs, my Biblical beliefs, preclude me from agreeing with any LGBTQ agenda." Father testified that his Christian religion "means everything" to him.

Mother was asked about her observations of N. when she drove him home from Father's house. She testified that N. "seemed a little down and out, and was a little shaken

3

up, and you know, I just asked if he was okay, and he said . . . 'I am now.'" She testified that N. told her that when he told his Father he was gay, his Father said, "No, you're not, but I love you anyway."

Later that evening, Father texted a picture to S. The picture is of two unhappy looking teenage girls with zig zag stitching across their chests with the typed statement above it: "It's not 'top surgery.' It's a radical elective double mastectomy performed on healthy girls who have been sucked into a cult by groomer schools and online influencers." Father wrote underneath the picture: "Don't ever do this stuff to yourself. If you ever want to talk about the thousands of UK children who regretted this and other things later in life, let me know. Also, I hope you read my google email to you."

Father sent a second text a few hours later to S. that showed a photograph of a bull with horns with the message, "If you're still confused about gender, try milking a bull and you'll learn real quick." Father texted underneath the photograph: "I think this one is hilariously accurate."

The next day Father texted Mother the following text messages over the course of an hour, each paragraph represents a separate text:

> You really have no idea who you are talking to. . . . The wolves will enter in and not spare the flock says our father. . . . The ascension of Christ opened the book of Revelation, it has been 80 generations now, but we are the last. And time is almost up. I will not be staying. Many will. You will understand after all of this is over. I promise, you will live to see. . . . You have no idea who I am. And you should thank me because if I can have you and your parents repent and turn before this is over, that's 3 souls I will get credit for saving.

* * *

4

I am a child of God.  I am a watchm[a]n.  They have been warned, but as instructed each has to work out our own salvation says our father.  Your fake Christian parents have been warned, or at least your father, to Repent and turn.

\* \* \*

For example, our father tells us about tranny's and gays right in the bible. He says any one who cuts off things or if man lay with man or women with women will be burned.  But the Holy See and most other Churches say, no, it's all good now.

\* \* \*

This is what Christ was talking about when he said, when I leave, I know the wolves will enter and not spare the flock.  You have no idea how close we are to Michael standing up.  But I promise, short of God taking you out prematurely, I do believe you will see.

\* \* \*

The spirit of Truth is upon you.  You are being shown the truth that you must bend to or you and your parents will burn.  It's that simple.

\* \* \*

You have been warned and will have no excuse now once asked to give an account.

Half an hour later, Father texted Mother a picture of a horned, animal-like human sitting on a throne and wrote that it is a picture of a deity called "Baphomet" that was "after everyone's children right now."  He continued:

What you are going to see very shortly in this world is of Biblical proportions. . . . As I stated to you before, we are the last and you have no idea how close we are to Michael standing up.  If you and your family do not repent and turn before that happens, you will be subjected to the plagues that follows after Michael stands.  Again, and for the last time, you and yours have been warned.

A CPS report dated June 21, 2022, was admitted into evidence. The case worker, a licensed social worker, wrote that five days after the incident between Father and N., she interviewed the children in person at their respective schools, and Mother and Father over the telephone. As to the interview with the children, she wrote:

> S[.] stated around 6th grade, his relationship with his father went downhill. S[.] stated he came out as transgender and his father blames his mother and says he is a part of a cult. S[.] stated he wanted to get into therapy and his father blamed his mother. S[.] stated his father threatens to sue his mother because he is transgender. S[.] stated he stopped seeing his father regularly in late 2019. S[.] stated he sometimes goes to his father's around the holidays because he wants to continue to see his cousins. S[.] stated his father has sent him text messages and emails with information against the LGBTQ+ community. S[.] denied feeling safe with his father. This worker asked why. S[.] stated he guesses it is more of an uncomfortable situation because he does not feel like he can be himself.
>
> This worker asked how his father treats N[.] S[.] stated this past weekend, their father kicked N[.] out of the house because he would not show him a TikTok because it stated he was gay. S[.] stated his father also threatened to break the phone. S[.] was not present for the incident. S[.] denied his father ever becoming physical with him or his mother. S[.] stated years ago, his father "slammed" N[.] because he was learning how to ride a bike and said something like "mom would have done it better". S[.] denied witnessing what happened.
>
> * * *
>
> N[.] stated he sees his father every other weekend. N[.] stated this past weekend was not good but normally they are fine. N[.] stated his father was mad because he would not show him his TikTok. N[.] stated he would not show him his TikTok because it showed his sexual orientation. N[.] stated he eventually told his father he was gay. *N[.] denied his father becoming physical with him and stated it was only verbal. N[.] stated his father was insulting his mother and said "you can go back with your psychotic mother".* N[.] stated he was picked up by his mother after this occurred. *N[.] stated his father sent him a text message stating he was being manipulated by his mother and sister and he should not allow the demons that surround him to influence him.* This worker asked how his father treats S[.] N[.] stated his father often uses the slur "tranny".

6

* * *

> This worker asked if his father ever became physical with him. N[.] stated when he was 9 years old, his father hit him on the head with an open hand because he said his mother would have taught him how to ride a bike better. N[.] denied any other physical altercations with his father and denied seeing his father become physical with anyone else. *This worker asked if N[.] felt safe with his father. N[.] stated not really because his father has "anger issues" and makes him feel scared like he may hit him. This worker asked what could help N[.] feel safe with his father. N[.] stated his father accepting him, getting less angry, and not saying bad things about their mother would help him to feel safe.*

(Emphasis added.)

During the social worker's interview with Mother, Mother told her that she filed the protective order because Father told her she "would rot in hell if she did not repent[,]" that he was "not of this world" and he was a "messenger of God" and it scared her. Although the social worker attempted to schedule an in-person appointment with him, Father was unwilling to do so. Father told the social worker over the telephone that Mother has influenced their children to believe that they are transgender and gay by taking them to pride parades before they have fully gone through puberty. He told her that "no one, not even a police officer, a judge, or a social services worker, will ever tell him what he is going to call his children or the pronouns he is going to use." He mentioned that "God does not agree with a man laying down with a man" and he expressed "how his faith does not agree with the LGBTQ+ community."

Father testified that since 2019, he has not seen S. nor does he have a relationship with S. He claims the lack of a relationship has "nothing to do with h[im] wanting to be called S[.]" or because he identifies as transgender but because Mother "encourages the

7

isolation, alienation, compartmentalization of the [F]ather." He testified that "most" of the texts that he has sent to S. over the last couple of years are related to S. identifying as transgender, and that his texts, which "reflect[] the truth[,]" are sent to present S. with an opposing view of the transgender community. He also admitted to sending a three page, single-spaced email to S. on March 5, 2022, which was admitted into evidence, in which he presented his detailed view of Mother's faults, the parties' failed marriage, and why the parties' divorced.

The court asked Father a few questions. The court asked if he and his children were "just not discuss[ing] the idea of transgender or homosexuality, or [do] you want them to be tolerant of you not accepting it, . . . are you . . . expecting tolerance both ways, or are you expecting only tolerance your way?" Father responded that when the children are older they can all be in the same room and "agree to disagree[,]" but that he texts S. "so that she has a picture of all sides." The court then asked Father if he texts S. "about anything else" and the following colloquy occurred:

> [FATHER]: Uh . . . I could check my phone, Your Honor, but – and I could talk for hours about what my beliefs are about –
>
> THE COURT: I'm not – that's not – look; this, to me, just so it's clear to everyone in the room, everyone can be – have their own beliefs. That's fine; I'm not one who's going to tell you what you should believe or shouldn't belie[ve], because some persons believe what's right or wrong. . . . You're not here to make me have your beliefs or anybody else. You're not here to convince me that their beliefs are right and you[rs] are wrong. I don't care. Right? All I care about is the impact in this circumstance of what is going on with regard to your children, and whether I believe they need some protection. That's what I – that's my job.
>
> So, I understand your beliefs, and you have very strong Biblical beliefs and you are entitled to those. But it's my question, what I'm trying

8

to get at, because I believe – and [Father's attorney], I apologize for asking some questions, but I believe that's really the heart of this case, is what is going on when you are communicating with them. Is there any more to you [inaudible] other than you trying to show these different views about transgender[?]

The court then reiterated its question about whether Father communicates with S. on other topics or texts him, "'I love you', 'I miss you', 'How are things going?', 'How's school?'" Father responded, "[t]here hasn't been much communication[.]"

Father again admitted that his relationship with his children is "pretty contentious because of what I would consider to be a concerted effort on their mother's part to pit one child against a parent" and to "purposely steer my son into this arena, because it's to her liking." He admitted to calling the police when Mother took the children to the Pride Parade, after which he called the Crisis Hotline and then Legal Aid. He testified that he is concerned for his children's souls and has no intent to harm them.

After both parties testified, the court interviewed both children privately. After the interview, the court summarized the interviews. The court stated that S. "is a strong person[,]" and although S. was "worried" about Father's behavior in the past, he was not upset by Father's current text messages. In contrast, the court stated that N. is "frightened" by Father's behavior and "worries" that Father does not believe him around his sexual identity, believing instead that it has to do with Mother's "manipulat[ion.]"

The court granted the protective order petition as to N. but denied the petition as to Mother and S. The court found by a preponderance of the evidence that Father "has repeatedly communicated in person and through text messages homophobic comments and religious beliefs, causing mental injury to N[.] N[.] communicated to the court that he is

9

fearful of his father because of his father's anger and aggressiveness in the past and his reaction to him coming out as gay." The order provides that Father: 1) shall not abuse or threaten to abuse N.; 2) shall not enter N.'s residence; 3) may continue to have visitation as set forth in the previous order but visitation with Father "can only occur if N[.] is comfortable doing so"; and 4) may call or text N. "but may not use that communication to abuse N[.] regarding sexual orientation and/or religion." The order is effective until June 22, 2023.

Father has timely appealed the court's order. We shall provide additional facts below where necessary to address the questions raised on appeal.

## DISCUSSION

### I.

Father argues that the circuit court erred in finding that Father inflicted a mental injury on N. and he advances two contentions. First, Father contends that Mother's petition for a temporary protective order was insufficient because it failed to allege facts from which a court could find that Father's actions and behavior caused mental injury to N. Second, Father contends that there was insufficient evidence presented at the final protective order hearing for the court to find that he caused mental injury to N. or that he did so intentionally. Mother responds that she sufficiently pled mental injury in her petition for a temporary protective order, and there was sufficient evidence presented at the hearing from which the circuit court could find by a preponderance of evidence that Father's actions caused mental injury to N. and that those actions were intentional. We agree with Mother. We explain.

10

Family Law ("FL") Article, subsection 5 of title 4 of the of the Maryland Code, governs domestic violence. Its purpose is "to protect and aid victims of domestic abuse by providing . . . immediate and effective remed[ies]" wide in variety and scope to "avoid future abuse." *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 134 (2001) (quotation marks and citations omitted). "[T]he primary goals of the statute are preventative, protective and remedial, not punitive." *Id.* (quotation marks and citations omitted).

A judge may issue a final protective order if they find abuse by a preponderance of the evidence. FL § 4-506(c)(1)(ii). "'[P]reponderance of the evidence' means 'more likely than not[.]'" *State v. Sample*, 468 Md. 560, 598 (2020) (citation omitted). "Abuse" of a child is defined as "the physical or mental injury of a child under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed[.]" FL § 5-701(b)(1)(i). *See* FL § 4-501(b)(1) and (2) (defining abuse and, if the victim is a child, includes the definition of abuse found in FL § 5-701(b)(1)(i)). *See also Charles Cnty. Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 300-02 (2004) (holding that the definition of child abuse for the issuance of a protective order includes the definitions stated in both FL §§ 4-501(b)(1)(2) and 5-701(b)(1)(i)).

"Mental injury" is defined by statute as "the observable, identifiable, and substantial impairment of a child's mental or psychological ability to function caused by an intentional act or series of acts[.]" FL § 5-701(r). Both physical and mental harm must be intentional and cannot be the product of an accident. FL § 5-701(b)(2) ("'Abuse' does not include the physical injury of a child by accidental means.") and *McClanahan v. Washington Cnty. Dep't of Soc. Servs.*, 445 Md. 691, 705-06 (2015) (holding that a finding of an intent to

11

harm is required in both mental and physical abuse cases). The scienter element of mental and physical injury can be met by showing a parent acted in reckless disregard for the child's welfare. *McClanahan*, 445 Md. at 712. "Reckless conduct" is conduct that amounts to a "gross departure from the type of conduct a reasonable person would engage in under the circumstances." *Id.* *See also Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 227 (2004) (Reckless conduct "is defined as . . . the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk.") (quotation marks and citations omitted). "Allegations of past abuse provide the court with additional evidence that may be relevant in assessing the seriousness of the abuse and determining appropriate remedies" because "a history of prior abusive acts implies that there is a stronger likelihood of future abuse." *Coburn v. Coburn*, 342 Md. 244, 257-58 (1996).

When reviewing the issuance of a final protective order, we accept the circuit court's findings of facts, unless they are clearly erroneous. *See* Md. Rule 8-131(c) and *Barton v. Hirshberg*, 137 Md. App. 1, 21 (2001). We "must consider evidence produced at the trial in a light most favorable to the prevailing party[.]" *Friedman v. Hannan*, 412 Md. 328, 335 (2010) (quotation marks and citation omitted). We defer to the trial court's credibility determinations because it "has the opportunity to gauge and observe the witnesses' behavior and testimony during the trial." *Barton*, 137 Md. App. at 21 (quotation marks and citation omitted). It is "not our role, as an appellate court, to second-guess the trial judge's assessment of a witness's credibility." *Gizzo v. Gerstman*, 245 Md. App. 168, 203 (2020). As to the circuit court's ultimate conclusion, "we must make our own independent

12

appraisal by reviewing the law and applying it to the facts of the case." *Piper v. Layman*, 125 Md. App. 745, 754 (1999).

## A. Temporary protective order petition

Father contends that Mother's petition for a protective order was insufficient to meet the applicable statutory requirements. Appellant did not raise this contention below, and therefore, it is not preserved for our review on appeal. *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]"). *See also DiCicco v. Baltimore Cnty.*, 232 Md. App. 218, 224-25 (2017) (noting that a contention not raised or considered below is not properly before an appellate court). Even if he had, we would find it without merit.

The primary purpose of pleadings is notice. *Tshiani v. Tshiani*, 436 Md. 255, 270 (2013). The Supreme Court of Maryland[2] has explained that "there need only be [a] substantial agreement between what is pleaded and what is proved[,]" but there shall be no "material variance" of the sort that would cause the other party to be "surprised unfairly or otherwise prejudiced in trying [his/her] case." *Id.* at 270. However, evidence in support of a protective order is not limited to the "four corners" of a petition and "allegations of a prior history of abuse are admissible at a protective order hearing regardless of whether such allegations were sufficiently pleaded in the original petition for protection." *Coburn*, 342 Md. at 262.

---

[2] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

In Mother's pro se petition for a protective order, Mother wrote that "on or about 06/11/22-06/12/22 & on", Father caused "mental injury" by engaging in the following: "mental abuse texts sent to the children, emails sent to children, texts sent to Petitioner." Under the circumstances, Mother's petition provided Father with sufficient notice of the relevant information that would support the issuance of a protective order. Father has never claimed surprise or unfair prejudice. We are persuaded that Father's contention regarding Mother's petition for a protective order is without merit.

## B. Final protective order

Father argues that there was insufficient evidence presented at the final protective order hearing to prove that he caused mental injury to N. or that he did so intentionally. In advancing this argument, Father attempts to redirect the gravamen of the case to the incident on June 12, 2022. He reframes the incident as not about his reaction to N.'s statement that he was gay but about N.'s refusal to let him see his phone and TikTok account, which was a challenge to Father's authority. Father then argues that his decision to end the visit was a "reasonable" way to discipline his son for refusing to give him access to his TikTok account. Father also reframes the court's conclusion after interviewing N. that he is "frightened," "worried," and "fearful with his [F]ather's anger," as a result of the text message Father sent N. the day before the incident. Father argues that the court's conclusion lacked "legal analysis or rational explanation" because the court failed to explain how the one text message frightened N. or how N.'s fear and worry impacted his ability to function mentally. Lastly, Father argues that because he specifically testified that he did not intend to harm N., there was insufficient evidence of the required intent.

14

We disagree with Father's arguments and hold that the circuit court did not err in finding that it was more likely than not that Father's actions caused substantial risk of harm to N. within the meaning of FL § 5-701(b)(1)(i), and Father's actions were intentional or with reckless disregard as to the consequences of his actions.

The Supreme Court of Maryland in *Katsenelenbogen*, 365 Md. at 139, addressed the standard by which we measure whether a child's mental or psychological ability has been impaired by an intentional act or series of acts. The Court stated:

> [A] belief as to imminent danger is necessarily founded upon the defendant's sensory and ideational perception of the situation that he or she confronts, often shaded by knowledge or perceptions of ancillary or antecedent events. The issue . . . [is] not whether those perceptions were right or wrong, but whether a reasonable person with that background could perceive the situation in the same way.
>
> We believe that to be the proper test to be applied in this context as well. A person who has been subjected to the kind of abuse defined in § 4-501(b) may well be sensitive to non-verbal signals or code words that have proved threatening in the past to that victim but which someone else, not having that experience, would not perceive to be threatening. The reasonableness of an asserted fear emanating from that kind of conduct or communication must be viewed from the perspective of the particular victim. Any special vulnerability or dependence by the victim, by virtue of physical, mental, or emotional condition or impairment, also must be taken into account.

*Id*. (quotation marks and citation omitted).

Under the circumstances presented, we find no error by the trial court in finding that Father had mentally abused N. The circuit court concluded that N. was "frightened," "scared," and "fearful" of his Father's anger and his Father's refusal to accept his sexual orientation. Contrary to Father's argument, in reaching that conclusion the court relied on, among other things, its interview with N. in which the court "saw with my own eyes" N.'s

15

fear about his Father's anger regarding his sexual orientation; the text message Father sent N. the day before their interaction on June 12, 2022, in which Father stated "you are being heavily manipulated and influenced by your mother and sister. . . . Please please do not allow these demons you are surrounded by influence you. Pray my son. For protection."; and the CPS report in which the social worker related that N. told her that he does not feel safe with Father, and he fears that Father might hit him because Father is angry and does not accept N.'s sexual orientation.

The court also heard Mother's testimony that when she picked N. up from Father's house after the incident and asked if N. was okay, N. responded, "I am now[,]" clearly suggesting that N. was not okay when he had been with Father. Additionally, the court expressly stated that it did not find credible Father's testimony that his actions were not intended to harm his children but were only intended "to just share another view." In assessing credibility, the circuit court is "entitled to accept – or reject – *all*, *part*, or *none* of the testimony of any witness, whether that testimony was or was not contradicted or corroborated by any other evidence." *Omayaka v. Omayaka*, 417 Md. 643, 659 (2011) (emphasis in original). Moreover, Father's communications with N.'s sibling and the resulting harm provided the court with additional evidence that was relevant in assessing the seriousness of the abuse and the "substantial risk of harm" to N. by Father's actions. *See Coburn*, 342 Md. at 257-58.

Under these circumstances, we find no error by the circuit court in ruling that there was sufficient evidence of mental abuse of N. by Father and that these acts were done

intentionally or with a conscious disregard or indifference to N.'s welfare.[3]  *See* FL § 5-701(r); *McClanahan*, 445 Md. at 712; *Taylor*, 384 Md. at 227.

## II.

Father argues that the circuit court abused its discretion in questioning the children. He seems to argue that first, the court should not have questioned the children at all, and second, the court erred when it failed to summarize the questions and responses during the private, judicial interviews of the children so that the attorneys could "understand what was asked and answered in order to present additional evidence[.]"  Although Father acknowledges that the Maryland General Assembly has not set out any rules regarding judicial interviews of children, he argues that the circuit court should have followed the guidelines set forth in *Karanikas v. Cartwright*, 209 Md. App. 571 (2013).  We find both of Father's arguments unpreserved, and even if he had preserved those arguments for our review, we would have found them meritless.

At the beginning of the hearing and prior to taking any testimony, Mother's attorney asked the court to speak to the children privately, and, if the court agreed, suggested that Mother could step out of the courtroom briefly to make arrangements for their presence.

---

[3] To the extent that Father baldly argues that only expert testimony can sustain a finding of mental injury, he cites no case law or rationale for this statement, and we decline to address it.  *See* Md. Rule 8-504(a)(6) (stating that an appellate brief "shall" include "[a]rgument in support of the party's position on each issue") and Md. Rule 8-504(c) (An "appellate court may dismiss the appeal or make any other appropriate order with respect to the case" for noncompliance with this Rule.).  *See also Oak Crest Vill., Inc. v. Murphy*, 379 Md. 229, 241 (2004) ("An appellant is required to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief.").

The court asked Father's attorney whether he had any objection, and the following colloquy

occurred:

> [FATHER'S ATTORNEY]:  I don't really see any reason why a conversation with the children is happening in Chambers.  These aren't two young children; they're a fifteen- and a twelve-year-old.
>
> THE COURT:  Oh, I'm not putting them on the stand.  If I'm going to talk to them, I'm going to talk to them like I do any child, and that's going to be in the courtroom with all of you outside, and I will summarize what is said when we come back in.
>
> [MOTHER'S ATTORNEY]:  That's what I'm requesting.
>
> THE COURT:  Uh-huh.  Uh-huh.
>
> [FATHER'S ATTORNEY]:  I would just request, if he wants evidence from the kids, that they be required to testify, which is the normal protocol.
>
> [MOTHER'S ATTORNEY]:  That is not the normal protocol in a family law case.
>
> THE COURT:  Yeah; I'm not . . . going to do that for 15 and 12, with these allegations.  I will speak to them privately in the courtroom, and I will do what I'm required to do, which is to summarize what it is that [inaudible] so everyone can present whatever other evidence they want, and we'll go from there.

Mother then stepped out to arrange for the children's presence, after which both parties

then testified.

Following the testimony of both Father and Mother, the following colloquy

occurred:

> THE COURT:  All right; this is how this is going to work.  I want to make this absolutely clear.  We are all going to walk down that hallway together. I am going to bring the children in, one at a time, and I am going to tell them, in front of them, what I am telling you right now, which is, the conversation between the two of us will be a conversation between the two of us.  I will summarize, as I'm required to do, after I have that discussion, when we come back into court.  But neither parent is to ask either child what I – what

18

questions I said, I asked, what they responded; that is not a topic of debate today or at any point moving forward. Does everyone understand that?

(INDISCERNIBLE CROSS-RESPONSE)

[FATHER'S ATTORNEY]: Is there going to be any cross-examination, or is this simply you're going to –

THE COURT: Just me.

[FATHER'S ATTORNEY]: Just the kids?

THE COURT: Just me. I'll summarize what was said. Just me.

The transcript reflects everyone left the courtroom at 3:54 p.m.; the court returned to the courtroom with one child and then the second; and the parties returned to the courtroom less than 20 minutes later, at 4:13 p.m.

Once the parties reconvened, the court stated:

All right; first of all, you have beautiful children; handsome children, very nice, educated, smart kids. And I will tell you, I am amazed how well-adjusted S[.] is. I'm going to call [him] S[.] because that's what [he] asked me to call [him], so I'm going to call [him] S[.] And [he] really is a strong person; right? And I will tell you that based on my conversation with [him], I'm going to deny any protective order with regard to S[.] [He]'s fine. [He]'s not worried about it; it's not mentally bothering [him]. [He] says it did, at times; [he]'s past that. And that [he] is – [he] loves the messages that you send [inaudible] but doesn't really faze [him] in terms of that. [He]'s not upset by them; it doesn't impact [him] on a daily basis, and it's not impacting [his] – [his] mental health or [his] physical health, and I don't feel like there's sufficient evidence with regard to mental injury as it's defined in the statute with regard to S[.]

The court then stated its reasonings for also denying a protective order for Mother. The court then began addressing his assessment of N., stating:

Now, N[.] is another case. He is – he is not as strong as S[.], at all, and I see him based on our conversation, he's frightened. He – he read a text message that, you know, you sent – that worries him about you not believing – believing that [inaudible]; you believe they're all being manipulated by

19

Mom, and that he needs to separate himself from that and – and things of that nature. And I think it's doing a lot of damage to N[.] right now, and it would be damag[ing] mentally if I did not grant a protective order [for N.]

At this point, Father's attorney asked if he could present a closing argument. The court said: "You can; sure. Say whatever you want to say." Father's attorney then presented argument that there was no abuse because: if there was abuse, it was an accident for Father never intended to abuse N., and the CPS Report did not indicate a finding of abuse.

## A.

As to Father's first argument, *i.e.*, that the court should not have questioned the children, he supports his argument by stating that had the court utilized the CPS Report, it could have avoided questioning the children; the court was "hellbent" on questioning the children; and the court was insensitive to the fact that special arrangements were required to transport the children to the courtroom for questioning.

Contrary to his argument on appeal, Father never argued below that the court should not speak to the children. Rather, he argued that the court should have required the children to testify in front of everyone by taking the stand in the courtroom. By not arguing below that the court should not question the children, he has not preserved his argument for our review. *See* Md. Rule 8-131(a). Even if he had, we do not believe that the court abused its discretion in questioning the children. We see absolutely no basis in the record to believe that the trial court was "hellbent" on interviewing the children or insensitive to the arrangements that were made to bring the children to the courtroom. Given the issues before the court, we find no abuse of discretion by the trial court in deciding to question

20

the children in the manner it did to minimize any further trauma to the children in this highly charged hearing.

**B.**

As to Father's second argument, *i.e.*, that the court erred when it failed to follow the guidelines set out in *Karanikas* for child interviews, Father's argument is again both unpreserved and meritless.

In child custody cases, it is axiomatic that a trial court has "discretion to interview a child[,]" and we review a trial court's decision "under an abuse of discretion standard." *Karanikas*, 209 Md. App. at 590-91 (quotation marks and citation omitted). Moreover, a "trial judge has discretion as to the length and content of a child interview." *Id*. at 588. Child interview law generally arises in the context of child custody cases because a child's preference to live with one parent over the other is a factor that "may" be considered in a custody order, although the court is not required to speak to the child. *Lemley v. Lemley*, 102 Md. App. 266, 288 (1994) (emphasis and citation omitted). We have found no law, nor have the parties directed us to any, that discusses the parameters of a court's interview of a child in the context of a protective order case.

Our jurisprudence provides that, at least in the context of a child custody case, a court's private interview with a child, in the absence of waiver or consent, is proper only (1) where the court reveals the contents of the conversation prior to making the custody award; or (2) the award is based on evidence produced in open court rather than on information obtained in private. *Marshall v. Stefanides*, 17 Md. App. 364, 368 (1973). We stated that one purpose of this requirement is to ensure that "some means of appellate

21

review of the interview is available." *Id.* at 369-70. This procedure is designed to "minimize[], as much as possible, the psychological impact on the child, and at the same time allow[] interested parties to produce all the evidence that is necessary to enable the court to arrive at a fair and just determination in accordance with the best interest of the child." *Id.* at 370.

*Marshall* concerned a child custody proceeding brought by parents of two children, aged 6 and 8, in which a court conducted a private interview that was not consented to by the mother, the substance of the children's statements in the interview was not revealed, and the Chancellor stated in awarding custody of the children to the father that it relied to a great extent upon information garnered from the interview. *Id.* at 367-85. The interviews took place after the father's testimony, during which the children appeared to have been in the courtroom. On appeal, we reversed and remanded. We agreed with the mother that the children were "possibly schooled" by the father's testimony as they had been in the courtroom when he testified, and because the mother had a "total lack of knowledge" of what the children told the Chancellor, found the interview was "fundamentally unjust" because the circumstances left the mother "in the untenable position of being called upon to answer, explain, or defend the alleged preferences of her [children] when she did not know what preferences or 'desires' they had expressed." *Id.* at 369.

*Karanikas* concerned parental requests for a modification of custody and visitation of the parties' 9-year-old child. 209 Md. App. at 575. At trial, the father asked the court to either interview the child in open court or chambers and to ask the child during the interview whether she preferred to live with one parent over the other. The court

interviewed the child in chambers. *Id*. at 587. Upon completion of the interview, the court advised the parties that he had asked the child general questions about her interests and her custody preference, and she had said that she had no preference for living with either parent. *Id*. at 587, 595. On appeal, father argued that the trial court erred because it conducted the interview in an "'an extremely limited and unreasonable fashion'" by only "'grudgingly'" agreeing to interview the child and refusing to ask the child her custody preference. *Id*. at 586, 589. We rejected the father's arguments. We failed to see any basis to support the idea that the judge "grudgingly" agreed to interview the child and, contrary to the father's argument, the court did ask the child its preference. *Id*. at 595.

Here, the court revealed the overall substance of its interview of the children, and the parties were given an opportunity to respond prior to issuing its order. While the court did not give a detailed, word-for-word question/response recitation of the interviews, the court revealed to the parties the gist of the interviews as related above. We note that what the court related about the interviews with the children was not surprising or new evidence to the parties. Before the interviews occurred, evidence was elicited that N. had stated to both his Mother and a social worker that he was fearful of Father because of his statements, actions, and texts regarding his views. Therefore, the general summation by the court about its interview with N. did not prevent Father from addressing N.'s concerns, and in fact, Father did address N.'s concerns by recasting and minimizing them. We think that under the circumstances, the court did not abuse its discretion in interviewing N. and allowing Father to respond to the gist of what was revealed. Accordingly, we hold that nothing more

23

was required under the circumstances presented, and we find no abuse of discretion by the court in its conduct of the interviews.

## III.

Father argues that the circuit court erred because its order was "only intended to punish [Father] for his unpopular parenting style and not to prevent future harm to N." According to Father, if the court believed Father might inflict mental injury on N., the court should have granted a "no contact" order. We disagree. We are persuaded that the relief granted was well-tailored to prevent future abuse.

Protective orders are intended "to protect any person eligible for relief from abuse." *See* FL § 4-506(c)(1)(ii). The Supreme Court of Maryland has said:

> The purpose of the domestic abuse statute is to protect and "aid victims of domestic abuse by providing an immediate and effective" remedy. *Barbee v. Barbee*, 311 Md. 620, 623 (1988). The statute provides for a wide variety and scope of available remedies designed to separate the parties and avoid future abuse. Thus, the primary goals of the statute are preventive, protective and remedial, not punitive. The legislature did not design the statute as punishment for past conduct; it was instead intended to prevent further harm to the victim.

*Coburn*, 342 Md. at 252. Once a finding of abuse has been established, "the court's focus must be on fashioning a remedy that is authorized under the [domestic abuse] statute and that will be most likely to provide that protection." *Katsenelenbogen*, 365 Md. at 136-37. "Prior abuse and the nature and severity of abuse may be relevant to certain types of relief[.]" *Id*. at 132 (quotation marks and citation omitted). Although issuance of a protective order may have consequences in subsequent litigation, "[t]hat is *not* the concern of the court[.]" *Id.* at 137 (emphasis in original). Rather, the concern is doing "what is

24

reasonably necessary – *no more and no less* – to assure the safety and well-being of those entitled to relief." *Id*. (emphasis in original).

Here, the court ordered the following relief:

1. Father "shall not abuse, threaten to abuse N[.]"

2. Father "shall not enter the residence of N[.] at [address omitted] or wherever the person eligible for relief resides."

3. "Custody shall remain as set forth in previous order, however, visitation with [Father] can only occur if N[.] is comfortable doing so."

4. Father "may communicate with N[.] through phone calls and/or text messages but may not use that communication to abuse N[.] regarding sexual orientation and/or religion."

(Capitalization omitted.) We think the relief ordered was reasonable and well-tailored to the facts presented.

It was N.'s fear and worry regarding Father's views about N.'s sexual orientation and Father's seeming inability to see that his views caused and could cause a substantial risk of harm to his son that the court attempted to address in its order. *See Boswell v. Boswell*, 352 Md. 204, 221 (1998) ("[W]hen the child's health or welfare is at stake[,] visitation may be restricted or even denied."). We find the court's relief went to addressing the substantial risk of harm to N. and the risk of future harm.[4] Father has put forth no evidence or argument that would convince us to the contrary.

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

[4] The parties do not raise in their appeal nor shall we address any constitutional rights regarding the freedom of religion or parental rights.

25